Filed 2/8/23  P. v. Ruiz CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049848 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. 21CR03816) |
| v. | |
| EDGAR ALFREDO RUIZ, | |
| Defendant and Appellant. | |

A jury convicted defendant Edgar Alfredo Ruiz of one count of willful infliction of corporal injury on a person with whom he had a dating relationship, based on evidence that he assaulted his former partner in their hotel room before leaving the hotel in her vehicle.

On appeal, Ruiz contends his conviction must be reversed due to instructional error. He maintains the trial court improperly instructed the jury on flight as evidence of consciousness of guilt, despite insufficient evidence to support the instruction. Further, Ruiz argues the flight instruction unconstitutionally discriminates against people of color and lowers the prosecution's burden of proof. Ruiz also contends the trial court erroneously refused to instruct the jury not to speculate as to whether third party assailants in the case had been charged. For the reasons explained below, we affirm.

# I. FACTS AND PROCEDURAL BACKGROUND

*A. Procedural Background*

In August 2021, the Santa Cruz County District Attorney filed a second-filed complaint (stipulated by the parties to be treated as the information) charging Ruiz with willful infliction of corporal injury resulting in a traumatic condition against Darlene E.,[1] a cohabitant with whom he had a dating relationship. (Pen. Code, § 273.5, subd. (a);[2] count 1.)

A jury found Ruiz guilty of the count charged.

On February 4, 2020, the trial court suspended imposition of sentence and placed Ruiz on three years of formal probation, the terms of which included 90 days of home detention, 20 hours of community service, individual counseling and completion of a batterer's intervention program. The court also granted a three-year protective order to Darlene E. and imposed a restitution fine and other fines and fees totaling $1,070.

Ruiz timely appealed.

*B. Evidence Presented at Trial*[3]

On June 9, 2019, Robin C. and her husband were asleep in their hotel room in Santa Cruz around 3:00 a.m. when the sounds of an argument woke them.[4] Robin could hear "[a]n altercation" in the room adjacent to them with a male voice and a female voice and what sounded like some shuffling, scuffling, and somebody "getting possibly thrown up against the wall a couple [of] times" and then again against the outside of their door. The argument was loud enough to wake Robin and her husband. The male was accusing

---

[1] To protect her privacy, we refer to the victim by her first name and last initial. (Cal. Rules of Court, rule 8.90(b)(4).)

[2] Unspecified statutory references are to the Penal Code.

[3] In addition to the testimony described below, the prosecution presented expert testimony on intimate partner violence and its effect on victims. That evidence is not relevant to this appeal.

[4] To protect her privacy, we refer to the witness by her first name and last initial and subsequently by her first name. (Cal. Rules of Court, rule 8.90(b)(10).)

the female of infidelity with a woman. The "thunking or hitting" against the wall several times was hard enough that if the pictures had not been screwed into the wall, they would have fallen off. The sound of something hitting the wall and the door of their hotel room was not the sound of a door slamming but sounded like a person getting pushed. Robin tried to call the hotel management but did not get through to anyone. She then called 911 because it sounded like the fight was escalating and she was concerned for the people next door.

That same morning around 3:00 a.m., a resident of downtown Santa Cruz, Christopher K.,[5] was walking home. Christopher saw a woman in the bushes by the Bay Front Inn.[6] It looked "out of the ordinary" so he stopped to see what was wrong. The woman kept popping her head out from the bush. When Christopher approached, the woman "didn't look okay" and looked upset, like she had been crying. She told him that she and her boyfriend were fighting and she was trying to hide from her boyfriend. It was dark but, when she came out from the bush a bit more, Christopher could see she had scratches on her leg. He offered for the woman to come back to his house to be safe and get away from the area but she did not want to go, so Christopher dialed 911 and let her use his cell phone. The police arrived, and Christopher left after giving the woman his phone number in case she needed any other help.

On the 911 call, Darlene E. told the dispatcher, "I'm calling because I'm (unintelligible) really beat up." Darlene E. reported that she was at the Bayside Inn, that her boyfriend beat her up and left her at the hotel, and that he was driving off in her Jeep with one of her dogs.

---

[5] To protect his privacy, we refer to the witness by his first name and last initial and subsequently by his first name. (Cal. Rules of Court, rule 8.90(b)(10).)

[6] The inn or hotel appears variously in the record as the Bay Front Inn, Bay View Inn, Bayside Inn, and Bay Inn.

3

Santa Cruz Police Officer Jeffrey Brouillette responded to the Bay Front Inn at 3:17 a.m. Brouillette waited for a few minutes outside of the hotel and during that time did not hear any disturbance or see anyone coming or going. He did not see Christopher or Darlene E. outside. Once other officers arrived, Brouillette knocked on the door of the hotel room. Darlene E. answered the door and spoke to the officers. No one else was in the hotel room. Brouillette observed that Darlene E. was crying on and off, shaking, and "generally acting fearful." She had "pretty significant injuries" to the right side of her face, which was swollen on the forehead and cheek bone. She also had several distinct scratch marks on the right side of her neck, minor bruising on her upper arms, and significant bruising on her left thigh. One of her pupils was larger than the other, which can be indicative of a brain injury.

While they spoke, Darlene E. appeared to be under the influence of alcohol. She smelled like alcohol, her speech was slurred, and her eyes were glassy and watery. However, she was not incoherent and did not appear to be falling over or unaware of her surroundings. Darlene E. did not follow a logical order in relating what had transpired but jumped around and was difficult to follow. At times "she would say something happened and then several minutes later say that the opposite happened." This was consistent with Brouillette's training and experience in speaking to victims of domestic violence. Brouillette's body-worn camera was recording throughout the conversation with Darlene E. Records from the Bay Front Inn for the dates in question reflect an online reservation made by Ruiz.

Darlene E. testified under subpoena that she has known Ruiz since high school. They dated for about eight years and lived together for three years with their two dogs. Around the time of the incident, Darlene E. and Ruiz visited Santa Cruz. They had come to see a friend and spend time at the beach with the dogs. Later, the three of them went to a bar in Capitola. Darlene E. had "a lot" of margarita cocktails ("[p]robably over ten") and "tons of shots." Their friend was also drinking, and Ruiz might have had a beer.

4

Darlene E. and Ruiz lived in Hayward at the time, so Ruiz booked a hotel to stay the night. Darlene E. testified that she was "too wasted" to reserve the hotel. She only recalled dancing at the bar, then getting into an "altercation" with one or two women outside of the bar, during which they pulled her hair and hit her. The women punched Darlene E. in her head, her hips, and her leg. She did not know where Ruiz or their friend was at the time the altercation happened. She testified that she was "super hammered" and "blurry" about whether she spoke to the police about her injuries. She only recalled "bits and pieces" of the evening.

Darlene E. did remember speaking with a defense investigator in September 2019 about the incident and explaining that Ruiz had gone to get pizza when the altercation with the women happened, and she had been upset with Ruiz because he did not help her while he was getting pizza. She did not recall anyone helping her or calling 911 after she got attacked outside the bar. She did not recall returning to the hotel room or what happened in the hotel room.

Listening to the 911 recording "[s]omewhat" helped her refresh her memory but most of the recording did not make sense because she was so intoxicated. She remembered that she had been angry with Ruiz because he had not been there to protect her from the bar fight and because he had taken her dog in the Jeep. Seeing the footage from the body-worn camera also did not help refresh her recollection. Though she told the officer that for the six months prior Ruiz had started to feel frustrated because they were not sexually connected, she "wasn't in [her] right mental state" and "was pretty angry at him because he wasn't there to . . . defend [her] when [she] was getting beat up." She was "probably saying these things . . . out of anger." She did not remember telling the officers that she got thrown down and that Ruiz punched her head and choked her, and that she was pushing him off, hitting him and telling him to get out.

Darlene E. also did not remember, as reflected on the body-worn camera footage, telling the officer that Ruiz kicked her out of the room and she tried unsuccessfully to

5

find hotel personnel, then hid in a bush and encountered a random passersby. Nor did she remember saying that she eventually got back inside the hotel room, where Ruiz hit her again, then left with her other dog. She did not recall telling the police that she was scared of Ruiz and that she was going to get killed if he were to get arrested. She was "angry" and "was taking [her] anger out on him." Since then, Darlene E. testified that she has been trying to "fix" the situation and get the district attorney to drop the case.

On cross-examination, Darlene E. repeated that over the long period in which she had a relationship with Ruiz, he was never physically aggressive or violent. She testified that she was stating the truth, was not trying to protect him, and is not financially dependent on him. Although they separated, Ruiz had retained his great relationship with her family and they remain friends. Darlene E. did not remember what started the fight with the women outside of the bar but remembered them pulling her hair and hitting her, and her being on the concrete. That is how she got injured.

The parties stipulated that Ruiz and Darlene E. were cohabitants at the time of the incident.

## II. DISCUSSION

Ruiz challenges his conviction on two grounds. First, he contends there was insufficient evidence to support the flight instruction, which he argues violated his constitutional rights to due process and a fair trial in that it lowers the prosecution's burden of proof and discriminates against people of color. Second, he contends the trial court violated his right to present a complete defense by refusing to instruct the jury not to speculate about why other persons (the alleged third-party assailants outside of the bar) were not charged in the case.

### A. *Flight and Consciousness of Guilt*

#### 1. Procedural Background

During deliberations over jury instructions, outside the presence of the jury, Ruiz's counsel objected to the standard jury instruction on flight (CALCRIM No. 372). Trial

6

counsel argued the instruction was not supported by the evidence, as there was "no evidence concerning – regarding consciousness of guilt." The prosecutor countered that there was evidence that Ruiz beat Darlene E. in the hotel room and left when the police arrived.

The trial court ruled that the instruction was supported. It explained, "There is evidence that there was a[n] altercation within the room, that there was a battery that occurred within the room. [¶] There is a witness in the form of [Christopher] who actually says he thought he saw law enforcement arriving at that time, and . . . there was evidence that Mr. Ruiz left or fled in the Jeep by [Darlene E.]. [¶] And [Christopher] did not see, I don't believe, the Jeep leaving, but there is evidence that he did leave the hotel. He did -- he was not present when law enforcement arrived, the Jeep was not present, okay. [¶] So [CALCRIM No.] 372 comes in."

The trial court instructed the jury that "if the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." (CALCRIM No. 372.)

In his closing argument, the prosecutor described the sequence after the altercation in the hotel room. "We know that the defendant left that hotel with one of the dogs. He left because he knew he had done something wrong and he didn't want to get in trouble. That's what happened that night. That's why the defendant is guilty in this case, because all of the evidence when viewed together corroborates only one reasonable conclusion in this case, that the defendant beat up his girlfriend that night, that the defendant caused those injuries, those traumatic conditions."

### 2. Legal Principles and Standard of Review

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for

7

the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) The court has a correlative duty " 'to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues.' " (*People v. Saddler* (1979) 24 Cal.3d 671, 681.) " ' "[B]efore a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference." ' " (*People v. Canizales* (2019) 7 Cal.5th 591, 609; *Saddler*, at p. 681.) A claim of instructional error presents an issue of law, which we review de novo. (*People v. Rivera* (2019) 7 Cal.5th 306, 326; *People v. Cole* (2004) 33 Cal.4th 1158, 1210 (*Cole*).)

3. Analysis

As a preliminary matter, we agree with the parties that, although Ruiz did not object in the trial court to the flight instruction on the federal constitutional ground he raises on appeal, the issue is not forfeited. Ruiz's counsel specifically objected to the instruction based on insufficient evidence that Ruiz's departure from the hotel was due to consciousness of guilt. After considering the parties' arguments, the trial court ruled against Ruiz and allowed the instruction. This determination preserved any objection based on insufficient evidence. (See *People v. Gomez* (2018) 6 Cal.5th 243, 286 (*Gomez*).) Further, Ruiz's claim that the flight instruction violated his right to due process because it discriminates against people of color and lowers the prosecution's burden of proof is reviewable insofar as it is a matter affecting the defendant's substantial rights. (§ 1259; *Gomez*, at p. 287; see also *People v. Cage* (2015) 62 Cal.4th 256, 285 (*Cage*).)

Turning to Ruiz's substantive arguments, Ruiz contends that the evidence at trial was insufficient to support the flight instruction and that the giving of the instruction violated his due process rights under the Fifth and Fourteenth Amendments. Ruiz challenges the predicate factual showing of flight to support the instruction. Having

8

carefully reviewed the record and relevant case authority, we conclude the instruction was warranted under the facts of this case.

As our Supreme Court has reaffirmed in several cases, "a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' " (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055 (*Bradford*); see also *People v. Abilez* (2007) 41 Cal.4th 472, 522 (*Abilez*); *People v. Bonilla* (2007) 41 Cal.4th 313, 328 (*Bonilla*); *Cage*, *supra*, 62 Cal.4th at p. 285.) Flight need not entail the " ' "physical act of running nor the reaching of a far-away haven" ' " (*Bradford*, at p. 1055) but only " ' "a purpose to avoid being observed or arrested." ' " (*Ibid*.) The instruction applies " 'whenever evidence of the circumstances of [a] defendant's departure from the crime scene . . . logically permits an inference that his movement was motivated by guilty knowledge.' " (*Abilez*, at p. 522; *People v. Turner* (1990) 50 Cal.3d 668, 694 (*Turner*).) We determine whether the flight instruction is warranted based on the facts of each case and circumstances of the defendant's departure. (*Abilez*, at p. 522; *People v. Mason* (1991) 52 Cal.3d 909, 941.) When there is evidence of flight, the trial court is required to instruct the jury that it may consider flight as evidence of guilt, though flight alone is not sufficient to establish guilt. (§ 1127c;[7] see *People v. Price* (2017) 8 Cal.App.5th 409, 458 (*Price*).)

Ruiz contends the evidence is too slight to support the inference that he left the hotel out of guilty knowledge, since there is no evidence that Ruiz knew the police had

---

[7] Section 1127c states, "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime, or after he is accused of a crime that has been committed, is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine. [¶] No further instruction on the subject of flight need be given." (§ 1127c.)

9

been called (or would be called), nor any indication that he left because he feared apprehension or arrest. He asserts that the evidence cited by the prosecution and relied on by the trial court—namely, that Ruiz left the hotel sometime before Darlene E. spoke to the 911 dispatcher and was not there when the police arrived—does not support the given inference, since his departure also supports other reasonable inferences (i.e., that he wanted to get away from an unpleasant situation with an intoxicated person). Ruiz points out that Darlene E. testified that she remembered him "showing up" at the hotel the next morning, supporting this alternate inference that he merely left to allow her to sleep off her intoxication.

Ruiz's argument relies on the mistaken premise that where there is no direct evidence that a defendant's departure was motivated by consciousness of guilt, and where there are plausible, alternate or innocent explanations for the alleged flight, it is error to permit the jury to infer consciousness of guilt. Our high court rejected nearly identical challenges to the predecessor standard jury instruction on flight (CALJIC No. 2.52) in *Abilez* and *Bonilla*.

In *Abilez*, the defendant contended that "giving the [flight] instruction was error because there were 'no facts' suggesting his decision to leave the victim's home was motivated by a desire to avoid detection or apprehension for the murder." (*Abilez*, *supra*, 41 Cal.4th at p. 522.) The Supreme Court disagreed that the facts at trial (showing that after the victim was killed, the defendant and codefendant loaded items from the victim's home into her car and drove off before being apprehended several miles away) were insufficient to support the instruction. It explained, based on the evidence, that "the jury could reasonably infer that [the] defendant's decision not to stay in the house [after the victim was killed], but instead to leave, manifested a consciousness of guilt." (*Ibid.*)

Similarly in *Bonilla*, the defendant challenged the flight instruction, claiming "there was no substantial evidence he fled" after the murder. (*Bonilla*, *supra*, 41 Cal.4th at p. 328.) The court clarified that "[t]o obtain the instruction, the prosecution need not

10

prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*Ibid.*) Based on evidence that the defendant "immediately left the scene" (*id.* at p. 329) and did nothing that "might have led to [his] detection . . . or otherwise connected him with the attack" (such as calling out or attempting to render aid), the court concluded it was not error to give the instruction. (*Ibid.*) In so concluding, the court reasoned that while "[t]he jury could attribute an innocent explanation to [the defendant's] conduct, [] it could also infer that his departure and the circumstances thereof were consistent with and supported the prosecution's theory," thus justifying the giving of the instruction. (*Ibid.*)

Here, the evidence at trial showed that sometime around 3:00 a.m., after an altercation in the hotel room, Ruiz left the hotel, taking Darlene E.'s Jeep and one of their two dogs. The altercation was loud enough to wake Robin and her husband, who were asleep in an adjacent hotel room, and led Robin to call 911 out of concern for the people involved. Although Darlene E. was injured prior to Ruiz's departure, there is no evidence he called 911 or tried to summon medical help for her.

Around that same time, Christopher spotted Darlene E. in the bushes outside the hotel, and Darlene told Christopher that she and her boyfriend were fighting and she was trying to hide from him. On the subsequent 911 call, Darlene E. told the dispatcher she was "really beat up" and that her boyfriend had beat her up and was driving off in her Jeep with one of her dogs.[8] On these facts, no less than in *Abilez* and *Bonilla*, the jury could reasonably infer that Ruiz's decision to leave the hotel in Darlene E.'s Jeep, without securing medical help for her, despite it being the middle of the night and having

---

[8] The transcript of the 911 call between the dispatcher and Darlene E. states, in relevant part, "[Dispatcher]: [] Who is this who beat you up? [¶] [Darlene E.]: My boyfriend. [¶] . . . [¶] He left me at the hotel and beat me up. [¶] [Dispatcher]: Okay, but where is he? [¶] [Darlene E.]: He's in my Jeep driving off with my other dog."

11

paid for the hotel room, manifested a consciousness of guilt. (*Abilez*, *supra*, 41 Cal.4th at p. 522; see also *Turner*, *supra*, 50 Cal.3d at p. 694.)

That there may be other plausible reasons for Ruiz having decided to leave the hotel room does not alter our conclusion that the circumstances were sufficient to permit an inference that "guilty knowledge" motivated his departure. (*Bonilla*, *supra*, 41 Cal.4th at p. 329; *Abilez*, *supra*, 41 Cal.4th at p. 522.) Indeed, the California Supreme Court in *People v. Navarette* (2003) 30 Cal.4th 458, 502 addressed this same point in its decision upholding the trial court's flight instruction based on CALJIC No. 2.52. The defendant in *Navarette* argued that "where the evidence suggests reasons for flight other than consciousness of guilt, the court should instruct the jury that it must determine whether the evidence in fact shows a consciousness of guilt." (*Ibid.*) The court rejected that argument, as it had in earlier decisions. (*Ibid.*, citing *People v. Barnett* (1998) 17 Cal.4th 1044, 1152 [explaining that the flight instruction, as given, "adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than [the] defendant's consciousness of guilt"]; see also *Bradford*, *supra*, 14 Cal.4th at p. 1055 [same].)

The instruction in this case (CALCRIM No. 372), like the substantially similar instructions in *Navarette* and its predecessors on this issue, properly allowed the jury to consider whether there was proof of flight, and if so, whether that flight showed consciousness of guilt. These circumstances are markedly different from *Gomez* and other cases[9] cited by Ruiz for the proposition that giving a consciousness of guilt instruction is improper where there are plausible alternate reasons for the defendant's conduct.

---

[9] The other cases cited by Ruiz, including *People v. Rankin* (1992) 9 Cal.App.4th 430, and *People v. Nguyen* (1993) 21 Cal.App.4th 518, are at best only marginally relevant to the issue before us and do not alter our conclusion set forth above.

12

*Gomez* involved a defendant's brief refusal to come to court on the second day of his capital trial, which ultimately had the effect of delaying the proceedings by 38 minutes (the defendant changed his mind and came voluntarily after threatened with an extraction order). (*Gomez*, *supra*, 6 Cal.5th at pp. 283–284.) The trial court issued a consciousness of guilt instruction at the conclusion of trial, stating in part that if the jury found the defendant "voluntarily absented himself from this trial by refusing to come to court," it could "consider that as a circumstance tending to prove a consciousness of guilt." (*Id*. at p. 286.) On review, the California Supreme Court held the trial court erred in allowing the jury to consider the defendant's temporary absence as a basis to infer consciousness of guilt. (*Id*. at p. 290.) The court distinguished the defendant's conduct from circumstances in other cases found to support the inference, such as where a defendant seeks to interfere with the production of evidence (e.g., by refusing to participate in a lineup) or acts in a way inconsistent with innocence (e.g., by tattooing the number "187" [Penal Code section for murder] on his forehead after a murder). (*Id*. at pp. 289–290.) The court reasoned that the defendant's effort to temporarily disrupt the proceedings "was not an attempt to elude prosecution or punishment" (*id*. at p. 289) and that his brief refusal to appear at trial had no "tendency in reason to prove" (Evid. Code, § 210) consciousness of guilt, noting he "may simply have been tired" or "frustrated by the trial process and wanted to assert more control over it." (*Gomez*, at p. 290.)

We do not construe the *Gomez* court's articulation of alternate reasons the defendant may have temporarily refused to come to court for his capital trial as authority for the general proposition that a jury cannot be permitted to infer consciousness of guilt when other plausible reasons might explain the defendant's conduct. To the contrary, the court in *Gomez* recognized the use of permissive inferences to allow jurors to infer consciousness of guilt when the evidence has some tendency in reason to support the inference. (*Gomez*, *supra*, 6 Cal.5th at pp. 288, 290.) We conclude that, as compared to the *Gomez* defendant's short-lived refusal to leave his cell, causing a 38-minute delay in

13

the trial proceedings, Ruiz's departure from the hotel in the victim's vehicle under the circumstances set forth above was sufficient to support an inference that his flight, if proven, could reflect consciousness of guilt.

Moreover, when there is evidence of flight, the trial court is statutorily required to instruct the jury that, although flight is not in itself sufficient to establish guilt, it may consider flight as evidence of guilt. (§ 1127c; *Price*, *supra*, 8 Cal.App.5th at p. 458.) Our high court has "construed section 1127c 'as mandating a rule that if there is evidence identifying the person who fled as the defendant, and if such evidence is relied on as tending to show guilt, then a flight instruction is proper.' " (*Abilez*, *supra*, 41 Cal.4th at pp. 521–522.) The prosecution in this case presented evidence that Darlene E. identified Ruiz as the person who "beat [her] up" and then left the scene "in [her] Jeep driving off with [her] other dog." The prosecutor relied on this evidence, arguing in closing that the evidence showed "the defendant left that hotel with one of the dogs" and "[h]e left because he knew he had done something wrong and he didn't want to get in trouble." The trial court therefore did not err under California statutory or decisional law in giving the standard CALCRIM No. 372 jury instruction on flight as evidence of consciousness of guilt.

Ruiz also challenges the flight instruction as a violation of his Fourteenth Amendment right to due process. He contends that, even if there were substantial evidence to justify giving the instruction (as we have so concluded), the trial court nevertheless erred because the instruction, as applied to people of color, is discriminatory and unconstitutional.

Ruiz argues that, although CALCRIM No. 372 appears neutral on its face, "the instruction has a disparate impact on Latinos" and other people of color, who comprise "two-thirds of California felony defendants" and "who have objective reasons to fear contact with police even when they have done nothing wrong." He contends that "what we now know about race and police destroys the inference of consciousness of guilt."

14

Ruiz asserts that where, as here, there was "no evidence" he fled the scene based on consciousness of guilt rather than "just getting away from his drunk and quarrelsome girlfriend," the giving of the instruction "invite[d] [the] jurors to draw a conclusion not based in fact and use that conclusion to find the defendant guilty." Ruiz argues that giving the instruction under these circumstances "reduces the People's burden of proof and is inconsistent with the presumption of innocence under *Sandstrom v. Montana* (1979) 442 U. S. 510."

Ruiz further maintains, in light of mounting recognition by courts that a person of color's flight from police (in the absence of other relevant factors) does not create reasonable suspicion for an investigatory stop (see, e.g., *United States v. Brown* (9th Cir. 2019) 925 F.3d 1150, 1156–1157 (*Brown*); *Commonwealth v. Warren* (Mass. 2016) 58 N.E.3d. 333, 342 (*Warren*)), that racially discriminatory law enforcement has "created reasons for innocent people of color to flee." He contends that allowing jurors to infer guilt from a person of color's alleged flight undermines recent efforts by the California judiciary to confront racism in the criminal justice system and asks that this court declare the flight instruction (CALCRIM No. 372) unconstitutional.[10]

Ruiz's arguments concerning the impact of racial disparities in policing are unavailing in this case because there is nothing in the record that suggests even an indirect relationship between systemic racial profiling or targeting, or any form of racial bias or disparate policing, and Ruiz's departure from the hotel. Ruiz left the hotel in the middle of the night after an altercation with his girlfriend from which she emerged injured; from this, the jury was reasonably permitted to consider Ruiz's departure in weighing guilt. (§ 1172c.) The same cannot be said for the inferences of reasonable

---

[10] Although this single reference in appellant's opening brief appears to assert a facial challenge to the standard jury instruction for flight and consciousness of guilt (CALCRIM No. 372), we do not understand Ruiz's arguments on appeal to present a facial challenge, nor has he provided any legal authority or cited appropriate legal standards to support such a challenge to the standard jury instruction.

15

suspicion in *Brown* and *Warren*, both of which involved investigatory stops prompted by the Black defendant's attempted flight from an unexpected encounter with police on the street in which the police intercepted or sought to contact the defendant.[11]

The reviewing courts in *Brown* and *Warren* recognized that racial dynamics in police practices can inform the weight or probative value assigned to a defendant's flight or evasive conduct during a police encounter.  (See *Warren*, *supra*, 58 N.E.3d. at p. 342; *Brown*, *supra*, 925 F.3d at p. 1157.)  We do not question the premise underlying those decisions:  Increasing awareness of racial disparities in policing and the broader criminal justice system may properly "inform the inferences to be drawn from an individual who decides to step away, run, or flee from police without a clear reason to do otherwise." (*Brown*, at p. 1156.)  Here, however, the flight was not *from police* but from a crime scene.  Far from fleeing "without a clear reason to do otherwise" (*ibid.*), a reasonable— albeit entirely permissive—inference based on the evidence was that Ruiz left the hotel in the middle of the night because he had just beaten up his girlfriend.

Furthermore, this is not a situation in which the inference of consciousness of guilt could not be fairly or reasonably directed to the charged offense (cf. *United States v. Myers* (5th Cir. 1977) 550 F.2d 1036, 1049), nor a case in which the permissive inference " 'is not one that reason and common sense justify in light of the proven facts before the jury.' " (*People v. Mendoza* (2000) 24 Cal.4th 130, 180 (*Mendoza*), superseded by statute on other grounds as stated in *People v. Brooks* (2017) 3 Cal.5th 1, 63, fn. 8.)  As explained by the California Supreme Court in *Mendoza* in relation to a different due process challenge to the substantially similar predecessor flight instruction (CALJIC

---

[11] In *Brown*, the defendant, a Black male, was walking on the street when he reacted to an unannounced pursuit by a police cruiser "by running for about a block before the officers stopped him at gunpoint." (*Brown*, *supra*, 925 F.3d at p. 1151.) *Warren* similarly involved two Black males walking down the street when a police officer, acting on a "hunch" following a reported burglary, called to them from his police cruiser and initiated pursuit when they jogged away. (*Warren*, *supra*, 58 N.E.3d. at p. 337.)

16

No. 2.52), the instruction does not impermissibly reduce the prosecution's burden of proof and is not inconsistent with the presumption of innocence under *Sandstrom* because the prosecutor must still prove facts that, if believed by the jury, logically and reasonably support the proposed inference. (*Mendoza*, at p. 179.) Citing United States Supreme Court precedent, the *Mendoza* court explained that a permissive inference " 'still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved. Such inferences do not necessarily implicate the concerns of *Sandstrom* []. A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.' " (*Mendoza*, at p. 180, quoting *Francis v. Franklin* (1985) 471 U.S. 307, 314–315.)

Applying Ruiz's claim concerning the discriminatory effects of racially disparate policing to the standard articulated in *Mendoza* does not support a due process violation here because Ruiz has not shown that the permissive inference was not justified in light of the facts presented at trial. Instead, as discussed *ante*, the evidence at trial provided sufficient support for the prosecution to argue that Ruiz fled the scene because he "knew he had done something wrong" and to warrant the flight instruction. (§ 1127c.) There was no due process violation because " 'the suggested conclusion [wa]s [] one that reason and common sense justif[ied] in light of the proven facts before the jury.' " (*Mendoza*, *supra*, 24 Cal.4th at p. 180.)

Even assuming Ruiz's arguments are founded on valid considerations regarding the impacts of racially disparate policing on inferences arising from a defendant's alleged flight, nothing in the cited case authority or record of this case supports his assertion that the giving of the instruction on these facts violated his due process rights. We conclude

17

that the trial court did not err on evidentiary or constitutional grounds by giving the flight instruction.[12]

### B. Other Perpetrators

#### 1. Procedural Background

In light of Darlene E.'s testimony that she had fought with two women outside of the bar while Ruiz was away getting pizza, Ruiz's trial counsel asked the trial court to instruct the jury on "other perpetrators" based on CALCRIM No. 373. The requested instruction states: "The evidence shows that other persons may have been involved in the commission of the crime charged against the defendant. There may be many reasons why someone who appears to have been involved might not be a codefendant in this particular trial. You must not speculate about whether those other persons have been or will be prosecuted. Your duty is to decide whether the defendant on trial here committed the crime charged."

The trial court initially noted its intent to give the instruction based on the evidence at trial that "other perpetrators" may have been involved in causing the injuries to Darlene E. and charged against Ruiz as caused by a domestic battery. The prosecutor objected to the proposed instruction and argued the " 'other perpetrator' " instruction is intended for circumstances involving accomplices, coparticipants, or codefendants and "doesn't apply to a case where the [d]efense theory is simply that some other unidentified unknown person committed the crime." The prosecutor further argued that the instruction would be confusing to the jury because it would suggest that another person was involved in the commission of the crime when the defense's theory was that the commission "had nothing to do with the defendant." Defense counsel countered that the instruction is "mandatory if requested in appropriate situations" and that the prosecutor's

---

[12] Given our decision that the trial court did not err in giving the flight instruction, which was supported by sufficient evidence in the record and consistent with Ruiz's rights to due process, we need not address the question of prejudicial error.

arguments about scenarios involving coparticipants or codefendants "doesn't negate the fact that in this instance it is also appropriate."

After further review of the relevant case authority, the trial court reevaluated its initial decision to include the CALCRIM No. 373 instruction. The court noted that unlike in the cited cases, where "the contended other perpetrators were all directly related to the actual events for which the defendant was on trial" in the manner of "an accomplice, an actual co-defendant, or aider and abettor," Ruiz's theory of defense was that an "unknown third party" inflicted the injuries. Defense counsel disagreed with the court's assessment and argued that the instruction "should be given upon request."

The trial court declined to give the instruction. It reiterated that in claiming that "individuals completely unrelated at different locations and different time" were responsible for Darlene E.'s injuries (as opposed to another person within the context of the charge against Ruiz), Ruiz's defense relied on "a different factual scenario than is anticipated and discussed in relationship to the other perpetrator instructions."

## 2. Legal Principles and Standard of Review

"A trial court has a duty to instruct on general principles of law that are 'closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case.' " (*People v. Moye* (2009) 47 Cal.4th 537, 554; accord *People v. Anderson* (2011) 51 Cal.4th 989, 996.) Furthermore, " 'a defendant has a constitutional right to have the jury determine every material issue presented by the evidence.' " (*Cole*, *supra*, 33 Cal.4th at p. 1215.) "That duty extends to ' "instructions on the defendant's theory of the case, including instructions 'as to defenses " 'that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' " ' " ' " (*Anderson*, at p. 996.) A criminal defendant also "has the right to instructions that pinpoint the theory of the defense case." (*People v. Gurule* (2002) 28 Cal.4th 557, 660.)

19

Whether to give a particular instruction in a particular case "entails the resolution of a mixed question of law and fact that . . . is [] predominantly legal." (*People v. Waidla* (2000) 22 Cal.4th 690, 733 (*Waidla*).) We independently review a trial court's decision not to give a requested instruction and decide, based on the entire record, whether sufficient evidence existed to warrant giving the omitted instruction. (*Cole*, *supra*, 33 Cal.4th at p. 1215; *People v. Breverman* (1998) 19 Cal.4th 142, 162.) In deciding whether a requested instruction should be given, the trial court resolves any doubts as to the sufficiency of the evidence to warrant instructions in favor of the accused. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944 (*Tufunga*).) But " '[a] party is not entitled to an instruction on a theory for which there is no supporting evidence.' " (*Ibid.*)

### 3. Analysis

Ruiz contends the trial court erred because there was substantial evidence at trial to give the requested defense instruction directing the jury not to consider whether Darlene E.'s alleged female assailants were charged. He asserts that an instruction not to speculate about other perpetrators was required, consistent with Darlene E.'s testimony at trial that two women attacked her outside the bar and the defense's theory that Ruiz did not cause Darlene E.'s injuries. According to Ruiz, CALCRIM No. 373 is the only standard jury instruction that seeks to prevent jurors from speculating about possible third party perpetrators and whether they have been charged. He maintains that without the instruction, "a jury considering whether to credit [Darlene E.]'s testimony would naturally give undue weight to inappropriate factors such as whether the parties she testified had assaulted her had been or would be charged with the crime, and if not, why not." He maintains that the court's refusal to give the instruction violated his Sixth and Fourteenth Amendment right to present a complete defense.

The Attorney General counters that CALCRIM No. 373 would not have served as a proper pinpoint or defense instruction in this case and that those cases in which the

20

instruction has been given have all involved coconspirators, accomplices, or aiders and abettors.

Having considered the evidence at trial, Ruiz's theory of defense, and the requested instruction, we conclude that Ruiz was not entitled to the CALCRIM No. 373 jury instruction because it has no application to the facts of this case. CALCRIM No. 373 refers to evidence that others "may have been involved" in committing the crime charged against the defendant but do not appear as codefendants in the trial and directs the jurors not to speculate about whether those persons have been or will be prosecuted. This wording strongly suggests that the instruction applies when there is evidence of an uncharged coparticipant; it is not an alternative perpetrator instruction. As indicated by the California Supreme Court's analysis of CALJIC No. 2.11.5 (the predecessor to CALCRIM No. 373), it pertains to "unjoined perpetrators of the same crime." (*People v. Farmer* (1989) 47 Cal.3d 888, 918 (*Farmer*), disapproved on other grounds by *Waidla*, *supra*, 22 Cal.4th at p. 724, fn. 6; see also *People v. Sully* (1991) 53 Cal.3d 1195, 1218 [same].) The Bench Notes to CALCRIM No. 373 also describe it as an instruction on "unjoined co-participants." (Bench Notes to CALCRIM No. 373.) As our high court stated in *Farmer*, "the instruction does not tell the jury it cannot consider evidence that someone else committed the crime. [Citation.] It merely says the jury is not to speculate on whether someone else might or might not be prosecuted." (*Farmer*, at p. 918, italics omitted.)

The instruction thus appears intended for circumstances in which a person who appears to have been an accomplice is not on trial with the defendant. Although there appear to be no reported cases in which courts have addressed a trial court's refusal to give the "other perpetrators" instruction when requested, those that address the instruction in other contexts (particularly in its predecessor CALJIC No. 2.11.5 form) support this assessment of the instruction and its nonapplication here. For example, in *Farmer*, evidence at trial suggested another perpetrator participated in the homicide, and

21

that individual was tried in a separate proceeding.  (*Farmer*, *supra*, 47 Cal.3d at p. 900 [footprints linked to the defendant and second individual, tried separately].)  So too, in *People v. Sanders* (1990) 221 Cal.App.3d 350, the court upheld the giving of the instruction since there was "evidence that a person other than the shooter may have been involved in the crime."  (*Id.* at p. 360.)  Darlene E.'s testimony that she got into a fight with two unknown women who assaulted her outside the bar while Ruiz was away getting pizza constituted an alternative explanation for her injuries apart from the crime charged against Ruiz and did not amount to factual support for an unjoined coperpetrator theory like in *Farmer* and *Sanders*.

Absent evidence of an accomplice or coparticipant in the charged domestic assault at the hotel, an instruction telling the jury not to consider "why someone who appears to have been involved might not be a codefendant in this particular trial" and "whether those other persons have been or will be prosecuted" (CALCRIM No. 373) would have served no purpose.  We conclude there was no evidence in the record to warrant giving the omitted instruction.  (See *Tufunga*, *supra*, 21 Cal.4th at p. 944.)  Because the requested instruction's formulation was inapposite to Ruiz's theory of defense, the court's refusal to give the instruction also did not violate his right to present a complete defense.  (Cf. *Crane v. Kentucky* (1986) 476 U.S. 683, 690.)  Indeed, even if Ruiz had requested a pinpoint instruction applicable to his theory that he did not commit the charged offense (i.e., directing the jury to consider whether evidence of Darlene E.'s alleged female assailants raised a reasonable doubt about Ruiz's guilt), such an instruction would have been duplicative of the standard instructions on reasonable doubt, which already "impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof."  (*People v. Hartsch* (2010) 49 Cal.4th 472, 504; see also *People v. Ledesma* (2006) 39 Cal.4th 641, 720–721.)

We decide the trial court did not err in refusing to give CALCRIM No. 373.  Our decision that the trial court did not err in declining to instruct on other perpetrators makes it unnecessary to consider whether the refusal to give the instruction was prejudicial.

### III.  DISPOSITION

The judgment is affirmed.

_____
                        Danner, Acting P.J.

WE CONCUR:



_____
Lie, J.




_____
Wilson, J.



**H049848**
*People v. Ruiz*