Filed 2/13/24  P. v. Dominguez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C096435 |
| Plaintiff and Respondent, | (Super. Ct. No. CR2021-79) |
| v. | |
| NATHAN ALEXANDER DOMINGUEZ, | |
| Defendant and Appellant. | |

Defendant Nathan Alexander Dominguez appeals following his convictions for kidnapping, kidnapping for robbery, burglary, dissuading a witness, and several other offenses.  He raises eight arguments:  (1) insufficient evidence shows he was involved in most of these crimes, (2) insufficient evidence supports the jury's kidnapping verdicts, (3) insufficient evidence supports the jury's verdict for dissuading a witness, (4) the trial court should have instructed the jury on false imprisonment as a necessarily included offense to kidnapping, (5) the trial court improperly instructed the jury about his flight from police officers, (6) he was improperly convicted of both kidnapping for robbery and

1

kidnapping based on the same conduct, (7) the trial court should have stayed execution of sentence on several counts, and (8) the trial court failed to fulfill its statutory duty to determine presentence custody credits.

We agree with Dominguez in part. He should not have been convicted of both kidnapping for robbery and kidnapping, the trial court should have stayed execution of sentence for certain counts (though not as many as he argues), and the trial court should have determined his custody credits. We will reverse the conviction for kidnapping, order certain counts of conviction be stayed, and remand for resentencing and calculation of credits.

BACKGROUND

I

*Robberies of G.C. and M.N.*

On October 26, 2020, G.C. visited a friend, M.N., at M.N.'s apartment. After a few hours, G.C. left the apartment and walked to the parking lot of the apartment complex. There, a car pulled up to G.C., and two men—later identified as Dominguez and Russell Hohman—jumped out. Hohman grabbed G.C.'s arm and showed him a gun. Dominguez also grabbed G.C. and carried a gun in his waistband.

Hohman and Dominguez both told G.C. that he needed to go to M.N.'s apartment and knock on the door. Hohman then pulled G.C. from the parking lot up three flights of stairs to M.N.'s apartment—a distance of "maybe less than 50 feet," according to G.C.—and G.C. knocked. After M.N. opened the door, Hohman hit M.N.'s head with the butt of his gun, knocked M.N. to the floor, and punched him several times. Dominguez pushed G.C. into the apartment and onto a couch. M.N., bleeding heavily from his head, joined G.C. on the couch shortly after.

Dominguez pointed his gun at G.C. and M.N. and forced both to hand over their wallets and phones. Around this time, M.N. managed to call 911 on his Apple Watch. But Dominguez noticed and said, "What the fuck are you doing," leading M.N. to take

2

off the watch, end the call, and hand the watch over. While Dominguez held G.C. and M.N. at gunpoint, Hohman went through the house, grabbed a laundry basket, and filled it with various items he found, including a laptop, Xbox, Nintendo Switch, belts, jewelry, and cash. Hohman also grabbed M.N.'s car keys.

Before leaving the apartment, Hohman told M.N. that he belonged to gangs and threatened to kill him if he sought help. Hohman left first, carrying the laundry basket filled with various items. Dominguez followed but then returned several times and checked on G.C. and M.N. A few minutes after Dominguez last checked on them, G.C. and M.N. looked outside and saw neither Hohman nor Dominguez. They also noticed that M.N.'s car was gone. The whole incident lasted about 10 to 15 minutes.

II

*Investigation of the Robberies and Dominguez's Flight*

G.C. and M.N. afterward stopped a nearby officer and reported the crimes. Both, however, hesitated to identify the two perpetrators and told officers they knew neither. M.N. recognized Hohman—and had even been robbed by Hohman before—but feared identifying Hohman because Hohman threatened to kill him if he talked. G.C. recognized both Hohman and Dominguez from high school but had similar concerns. He knew Hohman and Dominguez had a reputation for being involved in gangs and feared he could be killed if he identified them. Both M.N. and G.C., however, eventually identified Hohman as one of their assailants after officers found him driving M.N.'s car and brought him to M.N. and G.C. But neither M.N. nor G.C. named the second assailant. They instead described his features: He was a dark-skinned Hispanic, had long hair, and, according to G.C., was about five foot 11 inches tall and 170 pounds.

M.N. asked around to learn the identity of the second assailant. A friend responded that it was Dominguez—who is about six foot two inches tall, 230 pounds, and, depending on the person asked, described at trial as either a dark-skinned Hispanic (G.C.) or not dark-skinned (M.N. and two officers). M.N. shared Dominguez's name

3

with police two days after the robberies, and police then showed him a six-person photographic lineup. The lineup showed only two people with long hair—Dominguez and a person M.N. recognized from high school. M.N. selected Dominguez and afterward told G.C. that he was able to identify him based on the hair. The officer who prepared the photo lineup later acknowledged "it's not a great lineup."

In November 2020, after M.N. identified Dominguez, Dominguez drove up to G.C. and asked him to get in the car. Once G.C. got in, Dominguez showed him a gun but put it aside and said he would not do anything. Dominguez then told G.C. that the robbery "was [Hohman's] idea," that "he was just there," and that "he didn't want to get in trouble." He also asked if G.C. could get his parents "to drop their statement" to police (though G.C. was not aware of them making any statement), asked if he could talk to M.N. about retracting his statements and dropping charges, and asked if G.C. could retract any statement he had made. G.C. said there was nothing he could do and left the car.

That same month, police obtained a *Ramey* warrant[1] for Dominguez's arrest. On January 13, 2021, several officers in marked police cars pulled behind Dominguez's car and activated their lights. Dominguez slowed and pulled into a nearby parking lot. After a woman left his car and walked away, Dominguez made a U-turn, collided with a police car when the officer tried to block his path, and left the parking lot. He then led officers on a high-speed chase, though after about seven miles, officers called off the pursuit for safety reasons after Dominguez drove through several red lights, nearly hit a person in a crosswalk, and drove on the wrong side of a road. Officers later found Dominguez's

---

[1] A *Ramey* warrant is a warrant authorizing a residential arrest of a suspect before the filing of criminal charges. (*Goodwin v. Superior Court* (2001) 90 Cal.App.4th 215, 218, citing *People v. Ramey* (1976) 16 Cal.3d 263.)

4

abandoned car and, shortly after, found Dominguez in the back yard of a house stomping on his cell phone.

While searching Dominguez's car, officers found a bag of bullets. They also found an envelope, which was stamped "inmate mail," that listed Hohman in the return address and was addressed to Hohman's girlfriend. The envelope held five letters dated between November 3 and December 13 of 2020. Three were addressed to "Rock Face," one to "Stone Face," and one to "Stone Face, AKA Boulder Head"—with Stone Face being a name associated with one of Dominguez's social media accounts. In the letters, Hohman congratulated the recipient on the birth of a child (Dominguez's daughter was born in November 2020) and said he had "love for his homie," would not snitch, and would accept a plea deal. Officers also found that a license plate reader camera located near M.N.'s apartment captured the plate for Dominguez's car at 4:50 p.m. on October 26, 2020—which was about 20 minutes after M.N. called 911 on his watch.

On Dominguez's phone, officers found photographs showing the police report for the October 2020 crimes—a report that was not publicly available. Officers also found on the phone photographs showing a Louis Vuitton belt, Beats headphones, AirPods, a gold chain, and an Apple Watch with a gold strap. M.N. later testified that these items looked like items stolen from him.

Following Dominguez's arrest, G.C. identified Dominguez in a six-person photographic lineup in March 2021. Unlike the lineup shown to M.N., the lineup shown to G.C. included six people with long hair.

III

*Procedural History*

Dominguez was charged in an information with 13 counts:  (1) kidnapping to commit robbery (Pen. Code,[2] § 209, subd. (b)(1)), (2) kidnapping (§ 207, subd. (a)), (3) first degree robbery of G.C. (§§ 211, 212.5, subd. (a)), (4) first degree robbery of M.N. (*ibid.*), (5) first degree burglary (§ 459), (6) assault of M.N. with a semiautomatic firearm in the doorway (§ 245, subd. (b)), (7) assault of M.N. with a semiautomatic firearm on the couch (*ibid.*), (8) assault of G.C. with a semiautomatic firearm on the couch (*ibid.*), (9) dissuading a witness in October 2020 while using force or the threat of force (§ 136.1, subd. (c)(1)), (10) dissuading a witness in November 2020 (§ 136.1, subd. (b)(1)), (11) evading a peace officer with reckless driving (Veh. Code, § 2800.2), (12) possession of ammunition by a person prohibited from owning or possessing a firearm (§ 30305, subd. (a)), and (13) misdemeanor resisting or obstructing a peace officer (§ 148, subd. (a)(1)).

The information also alleged several enhancements.  For the kidnapping and robbery charges, the information alleged that Dominguez personally used a firearm (§ 12022.53, subd. (b)) and was armed with a firearm during the commission of the offenses (§ 12022, subd. (a)(1)).  For the burglary, assault, and October 2020 dissuading a witness charges, the information alleged that Dominguez personally used a firearm during the commission of the offenses.  (§ 12022.5, subd. (a).)  For the burglary and October 2020 dissuading a witness charges, the information further alleged that Dominguez was armed with a firearm during the commission of the offenses.  (§ 12022, subd. (a)(1).)  And for the burglary charge, the information also alleged that another person other than an accomplice was present in the residence at the time of the burglary.  (§ 667.5, subd. (c)(21).)

---

[2] Undesignated statutory references are to the Penal Code.

The jury could not reach a verdict on the charge of dissuading a witness in November 2020, leading the court to declare a mistrial for that count. The jury otherwise found Dominguez guilty as charged. The court afterward sentenced Dominguez to an indeterminate prison term of seven years to life, plus an aggregate determinate prison term of 14 years four months. Dominguez filed a notice of appeal with this court in June 2022. His opening brief was filed in April 2023, and this case was fully briefed on October 30, 2023.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Dominguez raises several challenges to the sufficiency of the evidence.

A.      *Identification of Dominguez*

He first argues that insufficient evidence shows he joined Hohman in committing the crimes on October 26, 2020. We disagree.

To determine if sufficient evidence supports a jury's finding, we must " ' "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Lee* (2011) 51 Cal.4th 620, 632.) Our job is not to reweigh witness credibility, for "[w]e do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable.' " (*People v. Navarro* (2021) 12 Cal.5th 285, 302; see *Lee,* at p. 632.) Nor is it our job to reweigh the evidence. We instead must resolve all conflicts in the evidence in favor of the judgment's findings, so long as these findings are based on substantial evidence and not speculation, supposition, or conjecture. (*Lee,* at p. 632; *People v. Davis* (2013) 57 Cal.4th 353, 360.)

Applying this deferential standard here, we find sufficient evidence supports the jury's finding that Dominguez participated in the crimes. Both M.N. and G.C. identified

7

Dominguez as one of the two perpetrators with one "hundred percent" certainty. And although M.N.'s identification of Dominguez might carry less weight, as we will cover below, G.C.'s identification was reasonable, credible, and of solid value. G.C. picked Dominguez out of a six-person photographic lineup three months after the crimes and later identified him again at trial. He also had good reason to recognize Dominguez—the two went to high school together. And while about four years had passed since high school, he still recognized Dominguez at the time of the crimes, though it "took [him] a while" to put a name to the face.

Other evidence corroborated G.C.'s identification. Most significantly, about a month after the crimes, Dominguez acknowledged his involvement in the robbery. He pulled up beside G.C. and asked him to get into the car. He then told G.C. that the robbery "was [Hohman's] idea and he was just there," asked if G.C. could get his parents to drop their statement to police, and asked if he could talk to M.N. about retracting his statements and dropping the charges. He also said "he didn't want to get in trouble" and asked G.C. if he could retract any statement he had made to police. These statements—including Dominguez's acknowledgment that he was present during the robberies—are powerful evidence of identity.

Evidence found on Dominguez's phone also connected him to Hohman and to the October 2020 crimes. His phone contained photographs showing at least 12 pages of the police report for these crimes—a report that was not publicly available but that Hohman, who had already been charged, would have received during discovery. A testifying officer believed, and a jury could reasonably infer, that Dominguez acquired this report from Hohman. Dominguez's phone also contained photographs showing several items that, according to M.N., were consistent with the items that had been taken from him. These included a Louis Vuitton belt, Beats headphones, AirPods, a gold chain, and an Apple Watch with a gold strap.

8

Other evidence placed Dominguez in the area around the time of the crimes. M.N. testified that the burglary occurred around 4:00 p.m. and lasted about 10 to 15 minutes. Evidence showing the time of M.N.'s abandoned 911 call from his watch was consistent with this estimate; it showed the call occurred at 4:32 p.m. Other evidence showed the car Dominguez drove was in the area around this time. A license plate reader camera located near M.N.'s apartment captured the car's license plate at 4:50 p.m.

Considered together, this evidence showed (among other things) that G.C. identified Dominguez as one of the two perpetrators of the October 2020 crimes, Dominguez later acknowledged his involvement in these crimes, Dominguez had photographs of some of the items alleged to have been stolen, Dominguez had photographs of the police report covering the crimes, and the car Dominguez drove was in the area around the time of the crimes. This evidence, considered together with the whole of the evidence, sufficiently supports the jury's finding that Dominguez joined Hohman in committing the offenses on October 26, 2020. (See *People v. Reed* (2018) 4 Cal.5th 989, 1006 ["Even identification of defendant by a single eyewitness may be sufficient to establish, beyond a reasonable doubt, defendant's identity as perpetrator of the crime charged"]; *People v. Grimes* (2016) 1 Cal.5th 698, 731 [" '[p]ossession of recently stolen property is so incriminating that to warrant conviction there need only be, in addition to possession, slight corroboration in the form of statements or conduct of the defendant tending to show his guilt' "].)

Although Dominguez highlights certain details that cut against some of the prosecution's evidence, he has not shown that the evidence as a whole was insufficient. He first focuses on M.N.'s identification. He argues the identification was not credible because M.N. initially described Hohman's companion as dark-skinned and with long hair, but according to M.N.'s testimony at trial, Dominguez is not dark-skinned. He adds that M.N.'s initial identification of him in a six-person photographic lineup was flawed because only two of the persons shown had long hair and M.N. knew one of those two

9

from high school. And he suggests that the friend who told M.N. that Dominguez was involved might be untrustworthy, noting that an investigating officer initially suspected that this friend might have been involved in the robberies—though the officer ultimately found there "wasn't any evidence that he was involved." But even accepting that M.N.'s identification of Dominguez was flawed, we would still find the evidence sufficient even if we ignored M.N.'s identification altogether.

Dominguez next focuses on G.C.'s identification. He argues his identification too was not credible because G.C. initially told officers he did not recognize the second suspect and offered a description that did not match Dominguez. He described the suspect as around five foot 11 inches tall, about 170 pounds, and dark-skinned, while Dominguez is six foot two inches tall, 230 pounds, and, according to M.N. and two others, not dark-skinned. He adds that G.C.'s identification of him in a photographic lineup was flawed because M.N. had told G.C. that Dominguez was involved before the lineup, G.C. had then viewed pictures of Dominguez online, and G.C. described Dominguez as having the longest hair in the lineup. Dominguez also claims that G.C. did not recognize him at the time of the robberies, though, in support, he cites only testimony showing that M.N. did not recognize Dominguez.

While these types of details are relevant to G.C.'s identification, so too are other details that Dominguez omits. Although G.C. initially told officers he did not recognize the second suspect, he later explained why—he thought Dominguez was a gang member and feared being killed. Although M.N. told G.C. that Dominguez was involved before G.C. identified him in a lineup, G.C. testified that he already suspected Dominguez beforehand and recognized him from high school. Although M.N. and two officers testified that Dominguez was not dark-skinned, G.C. testified otherwise; in his view, Dominguez *was* a dark-skinned Hispanic. And although G.C. said that Dominguez had the longest hair of those shown in the lineup, even defense counsel at trial accepted that everyone in the lineup (unlike those in M.N.'s lineup) had long hair. The jury could take

10

all these details into account and find G.C.'s testimony credible. And while Dominguez might believe that the jury should have given this testimony less weight, it is, again, not our place to reconsider the credibility of G.C.'s testimony and its appropriate weight. (See *People v. Reed, supra*, 4 Cal.5th at pp. 1006-1007 [it is the jury's role to assess the credibility of a witness's testimony and its weight].)

Lastly, Dominguez contends the evidence from the license plate reader camera is inconsistent with his involvement in the crime. He notes that the camera captured the license plate for his car four minutes before capturing the plate for the car that Hohman stole from M.N. He then contends these times are inconsistent with M.N.'s and G.C.'s testimony because both said that the second suspect left the apartment after Hohman and came back several times before leaving. Dominguez assumes, however, that Hohman drove away from the complex the moment he left the apartment and so should have arrived at the license plate reader camera before Dominguez. But while Hohman perhaps could have driven away immediately, we cannot say that he did. Dominguez may speculate along those lines, but we will not do the same. Dominguez adds that the presence of his car in the area was not "itself proof of guilt," since the camera often captured his car's plates in the area. But the camera evidence is not the only evidence of Dominguez's involvement; and for the reasons covered, we are satisfied that the evidence is sufficient to show his participation in the crimes.

B.    *Kidnapping and Kidnapping for Robbery*

Dominguez next asserts that insufficient evidence supports the jury's verdicts for kidnapping and kidnapping for robbery. Focusing on the asportation element for these crimes, he argues that the evidence is insufficient because it shows the movement of G.C. was merely incidental to the commission of the robberies. We disagree.

Both kidnapping for robbery (or aggravated kidnapping) and simple kidnapping have an asportation element. They each require "that the victim must have been moved 'for a substantial distance, that is, a distance more than slight or trivial.' " (*People v.*

11

*Martinez* (1999) 20 Cal.4th 225, 237, overruled on other grounds by *People v. Fontenot* (2019) 8 Cal.5th 57, 59; see *People v. Dominguez* (2006) 39 Cal.4th 1141, 1153 (*Dominguez*).) Aggravated kidnapping further "requires movement of the victim that is not merely incidental to the commission of the underlying crime and that increases the risk of harm to the victim over and above that necessarily present in the underlying crime itself." (*Martinez,* at p. 232.) The same is not required for simple kidnapping. But for a simple kidnapping case involving an associated crime, "the jury should be instructed to consider whether the distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality." (*Id.* at p. 237.)

In evaluating whether a victim's movement was incidental to an associated crime, we consider "the 'scope and nature' of the movement." (*People v. Rayford* (1994) 9 Cal.4th 1, 12.) "This includes the actual distance a victim is moved," though "there is no minimum number of feet a defendant must move a victim" for the movement to be found more than incidental. (*Ibid.*) We also consider "the context of the environment in which the movement occurred." (*Ibid.*) For instance, if " 'in the course of a robbery a defendant does no more than move his victim around inside the premises in which he finds him . . .[,] his conduct generally' " will be considered incidental to the robbery. (*Ibid.*) But when the defendant "change[s] the victim's environment" from a relatively public area to a more secluded area, the defendant's conduct is less likely to be considered merely incidental. (*Dominguez, supra*, 39 Cal.4th at pp. 1153-1154.) And even when a victim is moved "solely to facilitate the commission of the robbery," the movement is still not incidental if it is "for a substantial distance rather than brief." (*In re Earley* (1975) 14 Cal.3d 122, 130.)

Applying these principles and relevant case law here, we find the evidence sufficiently supports the jury's finding that the movement of G.C. was not merely incidental to the commission of the robberies. Hohman and Dominguez, both armed with guns, grabbed G.C. in the parking lot of M.N.'s apartment complex and told him to go to

M.N.'s apartment and knock on the door. Hohman then pulled G.C., with Dominguez following behind, from the parking lot to the front door of M.N.'s apartment—a distance of about 50 feet. After M.N. opened the door, Dominguez pushed G.C. into the apartment and onto a couch in the living room.[3]

While the total distance G.C. was moved—about 50 feet—might be insufficient in some cases, it was enough under the circumstances here to find the movement more than incidental to the robbery. The movement "changed the victim's environment"—moving G.C. from a publicly viewable space during the daytime (the parking lot) to a private area (M.N.'s apartment)—and thereby substantially decreased the likelihood of detection, escape, or rescue and enhanced Hohman's and Dominguez's opportunity to commit additional crimes. (*Dominguez, supra*, 39 Cal.4th at pp. 1153-1154.) These facts are sufficient to conclude that the movement was substantial (i.e., more than slight or trivial) and not merely incidental to the robbery. (See *ibid.*; *People v. Waqa* (2023) 92 Cal.App.5th 565, 583 [movement of eight to 10 feet found substantial]; *People v. Shadden* (2001) 93 Cal.App.4th 164, 167, 169 [movement of nine feet found sufficient].)

Case law is consistent with our conclusion. Take *Dominguez, supra*, 39 Cal.4th 1141. That case involved an aggravated kidnapping, though of a different type— kidnapping for rape rather than robbery. (*Id.* at p. 1151.) The defendant there moved the victim about 25 feet from the shoulder of a road down an embankment and partially into an orchard. (*Ibid.*) Although the court acknowledged "the distance is not great," it still found the movement "cannot be said to have been merely incidental to the rape." (*Id.* at pp. 1153-1154.) It explained that the movement "changed the victim's environment from

---

[3] In his reply brief, Dominguez disputes most of these facts. He argues G.C.'s testimony shows that he neither grabbed G.C. nor told him to knock on M.N.'s door, and that he "simply walked up the stairs behind" G.C. and Hohman. Dominguez misrepresents the record. G.C. testified, for instance, that both Hohman and Dominguez grabbed him and told him to knock on the door for M.N.

a relatively open area alongside the road to a place significantly more secluded, substantially decreasing the possibility of detection, escape or rescue." (*Ibid*.) The court's decision in *People v. James* (2007) 148 Cal.App.4th 446 is similar. The defendants there forced a business's employee—who had been hosing down a parking lot—to knock on the business's door to facilitate entry. (*Id.* at p. 456.) After gaining entry, the defendants threw the employee on the floor, stole money from the business and several employees, and then told the employees to wait in a bathroom while they escaped. (*Id.* at pp. 450-451.) Even though the record did not reveal the distance from the parking lot to the door, the court still found this evidence sufficient to conclude that the movement was not merely incidental to the robbery. (*Id.* at pp. 458-459.)

Although Dominguez attempts to distinguish the latter case, *People v. James, supra*, 148 Cal.App.4th 446, we find his efforts unpersuasive. He asserts *James* is different for several reasons: The victim there was confined to an "isolated room" (alluding, we think, to the bathroom), not an apartment. The victim was not a named robbery victim, unlike G.C. The victim was thrown on the floor, not pushed on a couch. And the robbery in *James* lasted an hour, not 10 to 15 minutes like the robberies here. But two of these alleged distinctions are questionable at best. Dominguez claims the victim in *James* was not a named robbery victim, but that is wrong; he was a named victim of robbery, though the defendant was not convicted on that robbery count. (*Id.* at p. 450, fn. 2.) Dominguez also claims the robbery in *James* lasted an hour. Although one witness testified along those lines, another said it lasted only eight to 14 minutes. (*Id.* at p. 451.) Still, we agree the facts in *James* are not identical to those here. And we expect that is true of all kidnapping cases—not one will be identical to another. But even accounting for the limited differences Dominguez has identified, we still find the case helpful to our analysis and supportive of our conclusion.

14

C.    *Dissuading a Witness*

Dominguez also contends insufficient evidence supports his conviction for dissuading a witness. We disagree.

Section 136.1 prohibits, among other things, a person from preventing or attempting to prevent a crime victim from reporting the crime to police or testifying at trial. (§ 136.1, subds. (a), (b).) It also, as relevant here, enhances the penalty for this conduct when the person acts knowingly and maliciously and uses force or threatens, either expressly or impliedly, to use force or violence against the victim. (*Id.*, subd. (c)(1).)

In this case, the prosecution charged Dominguez with an enhanced violation of this statute. It later described three separate theories for the charge in closing arguments—(1) Dominguez and Hohman threatened M.N. and G.C. that they would kill them if they talked to police, (2) only Hohman made this threat but Dominguez aided and abetted Hohman because he pointed a gun at M.N. and G.C., or (3) only Hohman made this threat but Dominguez should have foreseen that Hohman would make such a threat under the natural and probable consequences doctrine. Dominguez objects, however, that no evidence shows he threatened to kill either M.N. or G.C. He adds that although evidence shows Hohman threatened M.N., that is not enough to show that he had the specific intent to aid and abet Hohman or that he should have known Hohman would have made this threat.

The evidence, however, is more complicated than Dominguez lets on. True, the evidence shows that only Hohman expressly threatened to kill M.N. if he talked. But it also shows that Dominguez pointed his gun at M.N. and G.C. and told them to hand over their phones. It also shows that once M.N. used his Apple Watch to call 911, Dominguez said, "What the fuck are you doing," leading M.N. to take off the watch, end the call, and hand the watch over.

15

These facts are enough to support a conviction under section 136.1, subdivision (c). They sufficiently show that Dominguez prevented M.N. and G.C.—two victims of a crime—from contacting law enforcement; and the jury could reasonably infer that in taking their phones and M.N.'s watch, Dominguez knew he was preventing them from contacting law enforcement and intended to do so. (See *People v. Sherman* (2022) 86 Cal.App.5th 402, 414 [jury could reasonably infer that the defendant, "by attempting to prevent [the victim] from using her phone, was attempting to prevent her from reporting his criminal conduct"].) The facts also sufficiently show that Dominguez, in pointing a gun at M.N. and G.C., implicitly threatened to use force against them to advance this intent (see *People v. Bacon* (2010) 50 Cal.4th 1082, 1127 [possession of a firearm "may indicate an implied threat of violence"]); and that he acted maliciously—that is, he acted with "an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice" (§ 136, subd. (1)).

This case, to be sure, would be clearer had Dominguez expressly threatened to kill G.C. and M.N. if they talked to police. But as other courts have explained, a defendant need not say, "Don't testify," to violate section 136.1. (*People v. Pettie* (2017) 16 Cal.App.5th 23, 54.) Nor need a defendant say anything at all. " ' "As long as his words or actions support the inference that he . . . attempted by threat of force to induce a person to withhold testimony [or refrain from contacting law enforcement] [citation], a defendant is properly" convicted of a violation of section 136.1, subdivision (c)(1).' " (*Ibid.*) So it is here. Dominguez may not have voiced an explicit threat to harm G.C. and M.N., but his conduct still supported the inference that he attempted by an implicit threat of force to prevent those two from contacting law enforcement.[4]

---

[4] We acknowledge that the prosecution focused on different alleged facts to show that Dominguez violated section 136.1, subdivision (c)(1). But "theories suggested by the prosecutor are not the sole theories the jury may consider in making its determination of

16

*Jury Instructions*

Dominguez next challenges two parts of the trial court's jury instructions.

A.      *False Imprisonment*

He first contends the trial court violated its sua sponte duty to instruct the jury on false imprisonment, a necessarily included offense of kidnapping. We reject his argument.

"A trial court has a sua sponte duty to instruct the jury on any uncharged lesser offense that is necessarily included in a charged offense if there is substantial evidence from which the jury could reasonably conclude that the defendant committed the lesser included offense but not the charged offense." (*People v. Lopez* (2020) 9 Cal.5th 254, 269.) False imprisonment—"the unlawful violation of the personal liberty of another" (§ 236)—"is a necessarily lesser included offense of kidnapping" (*People v. Magana* (1991) 230 Cal.App.3d 1117, 1121). So if the evidence in a case would permit the jury to reasonably conclude that a defendant committed false imprisonment but not the charged offense of kidnapping, the trial court would have a sua sponte duty to instruct on the lesser offense of false imprisonment. "But a lesser included offense instruction on false imprisonment is not required where the evidence establishes that defendant was either guilty of kidnapping or was not guilty at all." (*People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1233.)

Here, Dominguez asserts the trial court had a sua sponte duty to instruct on false imprisonment. He notes the jury was given "two versions of the incident," with the

---

guilt." (*People v. Clark* (2011) 52 Cal.4th 856, 947 [rejecting a defendant's argument that his "convictions were inconsistent with the prosecutor's theory of the case"]; but see *People v. Brown* (2017) 11 Cal.App.5th 332, 341 [noting an exception when " 'one criminal act is charged, but the evidence tends to show the commission of more than one such act' "].)

prosecution arguing that G.C. was moved about 50 feet to M.N.'s apartment and the defense arguing that G.C.'s testimony was not credible, stating, for instance, that G.C. "can't be kidnapped because he's in on it" and "not a victim in any of this." Dominguez argues the "jury should not have been required to choose and fully credit only one of the two versions of the incident that were presented," noting that " '[t]ruth may lie neither with the defendant's protestations of innocence nor with the prosecution's assertion that the defendant is guilty of the offense charged, but at a point between these two extremes.' "

But Dominguez never explains how the jury could credit part of the prosecution's argument and part of the defense's argument and then conclude that he only committed the lesser offense of false imprisonment. And while he cites a part of the record showing that his trial counsel argued that G.C. was not credible, this is not "substantial evidence from which the jury could reasonably conclude that [Dominguez] committed the lesser included offense but not the charged offense." (*People v. Lopez, supra*, 9 Cal.5th at p. 269.) His counsel's argument was not even evidence at all. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 413, fn. 11 ["unsworn statements of counsel are not evidence"].) We thus find Dominguez has failed to show that the facts of this case required an instruction on false imprisonment.

B.    *Flight*

Dominguez also challenges the trial court's instruction about his fleeing from police. The court instructed the jury that "[i]f the defendant fled immediately after the crime was committed or after he was accused of committing the crime, that conduct may show that he was aware of his guilt." Dominguez argues this instruction was flawed for two reasons: first, because he fled the police three months after the robberies of G.C. and M.N., not immediately after; and second, because the instruction discriminates against people of color in failing to acknowledge that they may flee because of racially disparate policing rather than consciousness of guilt. He alternatively argues that to the extent the

18

flight instruction was proper based on his unlawful possession of ammunition at the time of the flight, he received ineffective assistance of counsel because his counsel failed to request a limiting instruction. We reject his arguments.

We start with Dominguez's challenge to the "immediately after" language. He asserts this language was inappropriate because he fled almost three months after the crimes around M.N.'s apartment. But as Dominguez ultimately acknowledges, those were not the only crimes charged in the case—he was also, relevant here, charged with unlawfully possessing ammunition. And the evidence shows that he fled the officers while unlawfully possessing this ammunition. That tended to show his awareness of the unlawful possession and favored the instruction about flight immediately after the crime was committed. (§ 1127c.)

We turn next to his alternative argument of ineffective assistance of counsel. He contends his counsel should have requested a limiting instruction that his flight may be considered only as to the ammunition possession and not as to the earlier crimes around M.N.'s apartment. But he has not shown that the flight instruction was, as he believes, altogether improper for these earlier crimes. Again, the instruction allowed the jury to consider his flight if he "fled immediately after the crime was committed *or* after he was accused of committing the crime." (Italics added.) And here, Dominguez fled after officers (in obtaining an arrest warrant) accused him of committing the crimes around M.N.'s apartment; and consistent with these circumstances, the prosecution argued that he fled because he knew he was "wanted for a kidnap for robbery from October 26th." (Cf. *People v. Leon* (2015) 61 Cal.4th 569, 607 [" 'the [flight] instruction neither requires knowledge on a defendant's part that criminal charges have been filed, nor a defined temporal period within which the flight must be commenced' "].) Dominguez neither disputes these facts nor even addresses this separate ground for the flight instruction. He thus has not shown, as required to show ineffective assistance, that his "counsel's

19

performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

We turn finally to Dominguez's claim that the instruction discriminates against people of color. He notes that racially disparate policing has created reasons for innocent people of color to flee. He then cites two cases finding that while flight may be suggestive of consciousness of guilt, racial dynamics can be relevant too. From this, Dominguez concludes that the trial court here should not have allowed "jurors to use flight in January 2021, three months after the charged crimes, to find that Dominguez was conscious of guilt as to the October 2020 incident, particularly where there is evidence that immediately before the 'flight' he was not only surrounded by police cars, but one of the cars rammed into the door closest to where he was seated."

Dominguez, however, offers a questionable portrayal of the facts and misunderstands the cases he cites. Starting with the facts, two officers who witnessed Dominguez's flight testified that Dominguez's car struck a police car, not the other way around. And although one officer acknowledged that camera footage appeared to show his car ramming Dominguez's car, he maintained that Dominguez hit him. He explained that he tried to cut off Dominguez's path to prevent him from fleeing the area; that before he could fully block Dominguez's path, Dominguez accelerated in front of him; and that while he tried to stop to avoid a collision, he could not stop in time. No witness, as far as Dominguez has shown, testified otherwise. Nor can we say that the camera footage is inconsistent with the officer's characterization.

Turning to the cases Dominguez cites, both evaluated whether an officer had reasonable suspicion to stop a Black male following flight. (*United States v. Brown* (9th Cir. 2019) 925 F.3d 1150, 1151; *Commonwealth v. Warren* (Mass. 2016) 475 Mass. 530, 531, 535-536.) Neither, however, "eliminate[d] flight as a factor in the reasonable suspicion analysis whenever a black male [or other person of color] is the subject of an investigatory stop." (*Warren,* at p. 540; see *Brown,* at p. 1156.) They instead said that

20

flight is not enough to establish reasonable suspicion and that data about racial disparities in policing "can inform the inferences to be drawn from an individual who decides to step away, run, or flee from police without a clear reason to do otherwise." (*Brown,* at pp. 1156-1157; see *Warren,* at pp. 538-540.) Nothing in the trial court's instructions here were inconsistent with this reasoning. These instructions told the jury that they could consider Dominguez's flight, but they explained that "evidence that the defendant fled cannot prove guilt by itself" and did not foreclose consideration of racial dynamics.

III

*Convictions for Both Kidnapping and Kidnapping for Robbery*

Dominguez next contends he could not be convicted of both kidnapping and kidnapping for robbery based on the same conduct. We agree, as do the People.

California law generally permits a jury to convict a defendant of multiple charges arising from a single act or course of conduct. (*People v. Sanders* (2012) 55 Cal.4th 731, 736.) But a " 'judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses.' " (*Ibid.*) "When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*Ibid.*)

In this case, Dominguez was found guilty of both kidnapping and kidnapping for robbery based on the same conduct—principally, the evidence that Dominguez and Hohman approached G.C. in the parking lot and then forced him to go to M.N.'s apartment. But because "simple kidnapping is a necessarily included offense of kidnapping to commit robbery," Dominguez could not be convicted of both. (*People v. Lewis* (2008) 43 Cal.4th 415, 518.) We thus will reverse the conviction for simple kidnapping.

21

IV

*Section 654*

Dominguez also raises several arguments based on section 654. The trial court, as relevant to this argument, imposed sentences for the aggravated kidnapping, robberies, burglary, and two assaults of M.N. with a firearm, without staying execution of sentence for any of these offenses. Dominguez asserts this was wrong, reasoning that section 654 bars multiple punishments for the robberies, burglary, and aggravated kidnapping and similarly bars multiple punishments for the two assaults of M.N. The People agree in part, conceding that Dominguez could not be punished for both the robbery of M.N. and the burglary, nor could he be punished for both assaults of M.N. We agree with the People and otherwise reject Dominguez's position.

"Section 654 precludes multiple punishments for a single act or indivisible course of conduct." (*People v. Hester* (2000) 22 Cal.4th 290, 294.) A course of conduct is indivisible "where the defendant ' "harbored a single intent." ' " (*People v. Mesa* (2012) 54 Cal.4th 191, 199.) So "if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once." (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) But if the "defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*Ibid.*) "[S]ection 654 does not apply to crimes of violence against multiple victims." (*People v. Correa* (2012) 54 Cal.4th 331, 341.)

Applying section 654 here, we agree, as the People concede, that Dominguez could not be punished for both the robbery of M.N. and the burglary; he instead could be punished for only one or the other. That is because Dominguez harbored the same criminal intent for both crimes—the intent to steal M.N.'s property. (See *People v. Smith*

22

(1985) 163 Cal.App.3d 908, 912.)  We agree too, as the People further concede, that Dominguez could not be punished for both assaults of M.N. with a firearm.  Both assaults occurred in M.N.'s apartment on October 26, 2020.  The first involved an assault in the doorway to M.N.'s apartment; the second involved an assault on the couch in the apartment when Dominguez pointed his gun at M.N.  Because Dominguez harbored the same criminal intent for both assaults—the intent to secure M.N. while Dominguez and Hohman stole M.N.'s property—he could not be punished for both assaults.

We disagree, however, with Dominguez's remaining arguments that section 654 barred multiple punishments for the robberies, burglary, and aggravated kidnapping.  The robbery of M.N. and the aggravated kidnapping are not subject to section 654 because they were acts of violence against different victims.  (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 230 [robbery and burglary at gunpoint are acts of violence for purposes of § 654]; *People v. Centers* (1999) 73 Cal.App.4th 84, 100 [kidnapping at gunpoint is an act of violence for purposes of § 654].)  The robbery of G.C., the burglary, and the aggravated kidnapping are also not subject to section 654.  The burglary (on the one hand) and the robbery of G.C. and the aggravated kidnapping (on the other) were acts of violence against different victims—M.N. for the burglary and G.C. for the other crimes.  And while the robbery of G.C. and the aggravated kidnapping involved the same victim, they involved different objectives.  Dominguez's objective in the robbery of G.C. was to steal from G.C.  But his objective in the aggravated kidnapping was more complicated.  He sought principally to facilitate the burglary and robbery of M.N., as Dominguez appears to concede.  Because the burglary, the aggravated kidnapping, and the robbery of G.C. all involved either different victims or different objectives, section 654 does not come into play.

23

## V

### *Custody Credits*

Lastly, Dominguez contends the trial court failed to fulfill its statutory duty under section 2900.5 to determine presentence custody credits. We agree, as do the People. The trial court must determine these credits on remand.

### DISPOSITION

The conviction on count 2 for kidnapping is vacated, the sentence is reversed, and the matter is remanded to the trial court for full resentencing, as described by this opinion, including, but not limited to, the trial court's exercise of discretion as to which counts to stay and the recalculation of custody credits. The judgment is otherwise affirmed. Following resentencing, the trial court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.

　　　　　　　　　　　　　　　　　　 /s/
　　　　　　　　　　　　　　　　BOULWARE EURIE, J.

We concur:


　　 /s/
DUARTE, Acting P. J.


　　 /s/
WISEMAN, J.[*]

---

[*] Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.