**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellee*,

v.

DANIEL DEREK BROWN,
           *Defendant-Appellant.*

No. 17-30191

D.C. No.
2:16-cr-00056-
JCC-1

OPINION

Appeal from the United States District Court
for the Western District of Washington
Carolyn R. Dimmick, District Judge, Presiding

Argued and Submitted November 6, 2018
Seattle, Washington

Filed June 5, 2019

Before:  M. Margaret McKeown and Michelle T. Friedland,
Circuit Judges, and Fernando J. Gaitan, Jr.,[*] District Judge.

Opinion by Judge McKeown;
Concurrence by Judge Friedland

---

[*] The Honorable Fernando J. Gaitan, Jr., United States District Judge
for the Western District of Missouri, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel reversed the district court's order denying a motion to suppress evidence obtained after police officers stopped Daniel Brown following an anonymous tip that a black man was carrying a gun, which is not a criminal offense in Washington State.

The panel held that the officers lacked reasonable suspicion that criminal activity was afoot before stopping and frisking Brown. The panel wrote that the totality of the circumstances does not add up to enough: no reliable tip, no reasonable inference of criminal behavior, no police initiative to investigate a particular crime in an identified high crime area, and flight without any previous attempt to talk to the suspect. The panel was particularly hesitant to allow flight to carry the day in authorizing the stop, given that racial dynamics in our society—along with a simple desire not to interact with police—offer an "innocent" explanation of flight, when every other fact posited by the government weighs so weakly in support of reasonable suspicion.

Concurring, Judge Friedland wrote separately to elaborate on three points: (1) the presumptive legality of carrying a concealed firearm in Washington makes this case distinguishable from *Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018); (2) to help explain why the result here is different from that in *Illinois v. Wardlow*, 528 U.S. 119

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(2000), it is helpful to think of justification for a *Terry* stop as a calculus in which the factors raising suspicion must, after aggregating their relative weights, add up to reasonable suspicion; and (3) nothing in the record supports the conclusion that the officers were stopping Brown simply because he was black.

## COUNSEL

Jason B. Saunders (argued), Law Offices of Gordon & Saunders PLLC, Seattle, Washington, for Defendant-Appellant.

Charlene Koski (argued), Assistant United States Attorney; Annette L. Hayes, United States Attorney; United States Attorney's Office, Seattle, Washington; for Plaintiff-Appellee.

## OPINION

McKEOWN, Circuit Judge:

David Derek Brown, who is a black man, had the misfortune of deciding to avoid contact with the police. Following an anonymous tip that a black man was carrying a gun—which is not a criminal offense in Washington State—police spotted Brown, who was on foot, activated their lights, and pursued him by car, going the wrong direction down a one-way street. Before flashing their lights, the officers did not order or otherwise signal Brown to stop. Brown reacted by running for about a block before the officers stopped him at gunpoint.

With no reliable tip, no reported criminal activity, no threat of harm, no suggestion that the area was known for high crime or narcotics, no command to stop, and no requirement to even speak with the police, we are left with little more than Brown's flight from the officers, which is not enough under the circumstances. In today's world, Justice Stevens' observations some twenty years ago are particularly prescient:

> Among some citizens, particularly minorities and those residing in high crime areas, there is also the possibility that the fleeing person is entirely innocent, but, with or without justification, believes that contact with the police can itself be dangerous, apart from any criminal activity associated with the officer's sudden presence.

*Illinois v. Wardlow*, 528 U.S. 119, 132 (2000) (Stevens, J., concurring in part and dissenting in part). Without more specific, articulable facts supporting their actions, we

conclude that the officers lacked the requisite reasonable suspicion that criminal activity was afoot before stopping Brown. Accordingly, we reverse the district court's order denying Brown's motion to suppress.

## BACKGROUND

This case began with a 911 call reporting that an unidentified resident at the YWCA claimed "they saw someone with a gun." On January 11, 2016, around 7:20 p.m., Sandra Katowitz—an employee at the YWCA in the Belltown neighborhood of Seattle—called 911, which dispatched the information to the Seattle Police Department ("Seattle Police"). Katowitz stated that "[o]ne of [her] residents just came in and said they saw someone with a gun." Katowitz never saw the gun herself. Through Katowitz, the resident described the man as a young, black man of medium build with dreadlocks, a camouflage jacket, and red shoes. The 911 dispatcher asked Katowitz specific questions about what Brown was doing with the gun. Katowitz answered that all her resident said was that "he has a gun."

Katowitz did not indicate that the resident yelled or shouted, was visibly upset by seeing the gun, or was otherwise alarmed by the gun's presence. Also, there was no indication that the man was loitering at the residence, was known at the YWCA, was harassing or threatening any residents there, or had done anything other than be seen by the resident. The resident remained in the lobby while Katowitz called 911, but on the call the resident can only be heard stating that she did not want to provide a firsthand report because she "[does not] like the police." The resident did not speak to the 911 dispatcher or the officers who responded to the call, nor did she provide her name.

While Seattle Police officers were speaking to Katowitz, two King County Sheriff's Office Metro Transit Unit ("Metro") officers heard and responded to the 911 call.[1] From his patrol car, Metro officer Ryan Mikulcik spotted Brown, who was on foot and matched the 911 description. Mikulcik called his partner, Curt Litsjo. Then Mikulcik began the pursuit, driving behind Brown slowly for several blocks before turning on his patrol lights and driving the wrong direction down a one-way street to follow Brown. Seeing the lights and patrol car coming from behind him, Brown ran. Mikulcik and Litsjo pursued Brown for one block before stopping him and ordering him to the ground at gunpoint. The officers placed Brown in handcuffs and found a firearm in his waistband. A further search revealed drugs, cash, and other items.

Brown moved to suppress the evidence from the searches, arguing that the officers lacked reasonable suspicion to stop him under *Terry v. Ohio*, 392 U.S. 1 (1968). The district court disagreed and denied the motion. We reverse.

## ANALYSIS

Recognizing that an officer may only "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot," *Wardlow*, 528 U.S. at 123, we must consider whether the officers' stop of Brown met this standard. In undertaking

---

[1] After speaking to Katowitz, the Seattle Police officers who responded to the call at the YWCA updated the dispatcher, saying that "we have no victim of any crime." The record is at best ambiguous as to whether the Seattle Police officers updated dispatch that there was "no victim of any crime" before Metro officers Mikulcik and Litsjo stopped Brown at gunpoint.

this fact-driven analysis, we consider de novo "the totality of the circumstances surrounding the stop, including 'both the content of information possessed by police and its degree of reliability.'" *United States v. Williams*, 846 F.3d 303, 308 (9th Cir. 2016) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)); *see also United States v. Edwards*, 761 F.3d 977, 981 (9th Cir. 2014).

Here, the lack of facts indicating criminal activity or a known high crime area drives our conclusion. The Metro officers who stopped Brown took an anonymous tip that a young, black man "had a gun"—which is presumptively lawful in Washington—and jumped to an unreasonable conclusion that Brown's later flight indicated criminal activity. At best, the officers had nothing more than an unsupported hunch of wrongdoing. The government's effort to rest reasonable suspicion on the tip and Brown's flight fails to satisfy the standard established by *Terry* and *Wardlow*. The combination of almost no suspicion from the tip and Brown's flight does not equal reasonable suspicion.

The tip suffers from two key infirmities—an unknown, anonymous tipster and the absence of any presumptively unlawful activity.

It is well established that an anonymous tip that identifies an individual but lacks "moderate indicia of reliability" provides little support for a finding of reasonable suspicion. *See Florida v. J.L.*, 529 U.S. 266, 270–71 (2000). As the Supreme Court has observed: "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Id*. at 270 (internal citations and quotation marks omitted).

Even though Katowitz identified herself, the actual source of the tip—the resident—remained anonymous. Nor did the tip provide any predictive information that might have served as indicia of reliability. *Compare White*, 496 U.S. at 332 ("Because only a small number of people are generally privy to an individual's itinerary [and future behaviors], it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities."). The Supreme Court has found a virtually identical anonymous tip insufficiently reliable to create reasonable suspicion. *J.L.*, 529 U.S. at 268, 270–72 (holding an anonymous tip that a young black man in a plaid shirt was carrying a gun insufficient to create reasonable suspicion).

The Court was clear in *J.L.* that "a tip [must] be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. None of the officers who responded to the 911 call articulated what crime they suspected Brown of committing. They stated only that they knew he had a firearm, testifying at the suppression hearing: "I heard them dispatch a call to a subject with a gun . . . ," and "I heard a call of a subject with a gun at - - in the Belltown area." These statements are illustrative for what is not said. Although an officer is not required to identify the exact crime he suspects, he must articulate suspicion as to some criminality, not simply "an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528 U.S. at 123–24 (quoting *Terry*, 392 U.S. at 27).

In Washington State, it is presumptively lawful to carry a gun. It is true that carrying a concealed pistol without a license is a misdemeanor offense in Washington. *See* RCW §§ 9.41.050(1)(a) ("[A] person shall not carry a pistol

concealed on his or her person without a license to carry a concealed pistol . . . ."), 9.41.810 (explaining that any violation of the subchapter is a misdemeanor "except as otherwise provided"). However, the failure to carry the license is simply a civil infraction. *Id.* § 9.41.050(1)(b) ("Every licensee shall have his or her concealed pistol license in his or her immediate possession at all times . . . . Any violation of this subsection . . . shall be a class 1 civil infraction . . . ."). Notably, Washington is a "shall issue state," meaning that local law enforcement *must* issue a concealed weapons license if the applicant meets certain qualifications. *Id.* § 9.41.070(1).

The anonymous tip that Brown had a gun thus created at most a very weak inference that he was unlawfully carrying the gun without a license, and certainly not enough to alone support a *Terry* stop. *Cf. Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (holding that unless there is a particularized suspicion that the driver is unlicensed, officers are prohibited from stopping drivers solely to ensure compliance with licensing and registration laws).

Faced with this reality, the government now argues that the officers suspected that the *manner* in which Brown was carrying his gun was unlawful: it is "unlawful for any person to carry, exhibit, display, or draw any firearm . . . in a manner, under circumstances, . . . that warrants alarm for the safety of other persons." RCW § 9.41.270. Never mind that nothing in the record could support such a finding. No evidence shows that the resident was alarmed at the time she reported seeing the gun. There is no report that she yelled, screamed, ran, was upset, or otherwise acted as though she was distressed. Instead, the 911 call reported only that the resident "walked in" and stated "that guy has a gun." The 911 dispatcher followed up trying to learn more about how

Brown was displaying the gun, other than simply possessing it. But Katowitz simply reiterated, "[u]h, she just came in and said he has a gun." Both of the officers that stopped Brown testified they were responding to a call about a "subject with a gun." Considering the tipster's anonymity and the presumptive legality of carrying a concealed firearm in Washington, the "tip" alone did not create reasonable suspicion that Brown was engaged in any criminal activity.

The government also offers a post hoc rationale, namely that the call coming from the YWCA—a women's shelter— was part of the whole picture considered by the officers. Nothing in the record suggests that Brown was in the shelter, loitering in front of the shelter, or harassing or threatening anyone around the shelter. To the contrary, Brown was walking away from the shelter at the time of the stop. While we do not take lightly the possibility of violence at a women's shelter, such a threat was not part of the totality of circumstances confronting the officers who ultimately stopped Brown. In the end, the 911 call revealed nothing more than an unreliable anonymous tip reporting presumptively lawful behavior. That is not to say that the tip has no weight, but under the totality of circumstances, it is worth little. *See United States v. Fernandez-Castillo*, 324 F.3d 1114, 1117 n.3 (9th Cir. 2003).

We next consider Brown's flight from the Metro officers. No one disputes that once the Metro officer activated his patrol car lights, Brown fled. But the Supreme Court has never endorsed a per se rule that flight establishes reasonable suspicion. Instead, the Court has treated flight as just one factor in the reasonable suspicion analysis, if an admittedly significant one. *Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing,

but it is certainly suggestive of such.").  Nonetheless, the Court has a long history of recognizing that innocent people may reasonably flee from the police:

> [I]t is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses. Nor is it true as an accepted axiom of criminal law that 'the wicked flee when no man pursueth, but the righteous are as bold as a lion.'  Innocent men sometimes hesitate to confront a jury; not necessarily because they fear that the jury will not protect them, but because they do not wish their names to appear in connection with criminal acts, are humiliated at being obliged to incur the popular odium of an arrest and trial, or because they do not wish to be put to the annoyance or expense of defending themselves.

*Alberty v. United States*, 162 U.S. 499, 511 (1896).

Notably, the officers did not communicate with Brown, use their speaker to talk with him, or tell him to stop before they flashed their lights and then detained him.  Under these circumstances, Brown had no obligation to stop and speak to an officer.  *See Florida v. Royer*, 460 U.S. 491, 497–98 (1983) (holding that an individual has no obligation to respond when police approach and ask questions).

The situation was far different in *United States v. Smith*, where the officer activated his siren twice, pulled over, and exited his vehicle before commanding Smith to stop.

633 F.3d 889, 891 (9th Cir. 2011). Smith, who was in a high crime area, turned around and questioned whether the officer was talking to him. *Id.* The officer clarified he was and again commanded Smith to stop. *Id.* After a very pointed back and forth with the officer, who made it clear that Smith should stop, Smith suddenly broke out into a headlong run, which the court found to be for "no other reason than to evade." *Id.* at 891, 894. As the officer approached, Smith said that he had a handgun in his pocket. *Id.* at 891.

The circumstances here are also very distinguishable from what law enforcement faced in *Wardlow*. There, the officers specifically "converg[ed] on an area known for heavy narcotics trafficking in order to investigate drug transactions" and discovered the suspect holding an opaque bag, who immediately ran after looking in the direction of the officers. 528 U.S. at 121–22, 124. Assessing the situation from the officers' reasonable perspective, the totality of the circumstances—the baggie, the high crime area, and the known heavy narcotics trafficking in that area—put Wardlow's flight from the officers in an extremely suspicious light. *See id.* at 124 ("It was in this context [of the officers anticipating encountering various people involved in drug crimes and seeing Wardlow holding an item consistent with drug trafficking] that [the officer] decided to investigate Wardlow after observing him flee."). By contrast, in the face of a weak tip, this case presents little more than a black man walking down the street in Belltown, which the government does not argue is a "high crime" area. There is no evidence that Brown was in an area known for unlawful gun possession, unlike the "heavy narcotics trafficking area" in *Wardlow*, nor did the officers observe Brown holding something or walking in a particular way that would corroborate the information that he might be carrying a gun. Brown did not refuse to speak with the officers after

a verbal request. Although Brown's flight might be suggestive of wrongdoing, it did not corroborate any reliable suspicion of criminal behavior.

In evaluating flight as a basis for reasonable suspicion, we cannot totally discount the issue of race. In explaining his understanding of the limits of the Court's opinion in *Wardlow*, Justice Stevens recognized that flight can be a problematic factor in the reasonable suspicion analysis because some citizens may flee from police for their safety. *See Wardlow*, 528 U.S. at 126–140 (Stevens, J., concurring in part and dissenting in part). Several years before Justice Stevens' concurrence, our court addressed at length "the burden of aggressive and intrusive police action [that] falls disproportionately on African-American, and sometimes Latino, males" and observed that "as a practical matter neither society nor our enforcement of the laws is yet color-blind." *Washington v. Lambert*, 98 F.3d 1181, 1187–88 (9th Cir. 1996). There is little doubt that uneven policing may reasonably affect the reaction of certain individuals— including those who are innocent—to law enforcement.

In the almost twenty years since Justice Stevens wrote his concurrence in *Wardlow*, the coverage of racial disparities in policing has increased, amplifying awareness of these issues. This uptick in reporting is partly attributable to the availability of information and data on police practices.[2] Although such data cannot replace the

---

[2] For example, relevant to this case, in 2011 the U.S. Department of Justice investigated the Seattle Police Department and released a report finding "a pattern or practice of using unnecessary or excessive force" and "serious concerns" about racially discriminatory policing. U.S. Dep't of Justice, *Investigation of the Seattle Police Department* 3 (2011), https://www.justice.gov/sites/default/files/crt/legacy/2011/12/16/spd_fi ndletter_12-16-11.pdf. Since this report, the Department has been

"commonsense judgments and inferences about human behavior" underlying the reasonable suspicion analysis, *Wardlow*, 528 U.S. at 125, it can inform the inferences to be drawn from an individual who decides to step away, run, or flee from police without a clear reason to do otherwise. *See id.* at 133 ("Moreover, these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices." (footnote omitted)). Given that racial dynamics in our society—along with a simple desire not to interact with police—offer an "innocent" explanation of flight, when every other fact posited by the government weighs so weakly in support of reasonable suspicion, we are particularly hesitant to allow flight to carry the day in authorizing a stop.

Even under *Wardlow*, flight itself—the "consummate act of evasion"—is not tantamount to guilt. Although flight *may* be suggestive of wrongdoing, the absence of other factors here, when considered alongside a tip that is entitled to little weight, underscores the lack of reasonable suspicion.

## CONCLUSION

In the end, the totality of the circumstances here does not add up to enough: no reliable tip, no reasonable inference of criminal behavior, no police initiative to investigate a particular crime in an identified high crime area, and flight without any previous attempt to talk to the suspect. We

---

subject to a Consent Decree focused on eliminating the identified constitutional violations. *See United States v. City of Seattle*, No. C12-1282JLR, 2018 WL 6304761, at *1 (W.D. Wash. Dec. 3, 2018). Two years after Brown's arrest, in January 2018, a federal judge determined the Seattle Police Department was fully compliant with phase one of the Consent Decree, although review under the decree continues. *See id.* at *1–2.

conclude that the Metro officers did not have reasonable suspicion of criminal activity when they stopped and frisked Brown.  Accordingly, we **REVERSE** the district court's denial of the motion to suppress.

---

FRIEDLAND, Circuit Judge, concurring:

I agree that Metro officers Mikulcik and Litsjo did not have a reasonable suspicion that Brown was engaged in a crime when they stopped him, so I concur in the majority opinion.  I write separately to elaborate on a few points.

First, the presumptive legality of carrying a concealed firearm in Washington makes this case distinguishable from our recent decision in *Foster v. City of Indio*, 908 F.3d 1204, 1215–16 (9th Cir. 2018), in which we held that an officer could have reasonably believed that an anonymous tip alleging that an individual had a gun created reasonable suspicion.  There, even though the tip did not state that the person was carrying the gun illegally or was about to commit a crime, we held that a reasonable officer "could have concluded that the tip . . . provided information on potential illegal activity" because it is presumptively unlawful to carry a concealed weapon without a permit in California, which issues concealed carry permits to only 0.2 percent of its adult population.  *Id.* at 1215.  In comparison, Washington is not only a "shall issue state," as the majority opinion emphasizes; it is also a state in which almost ten percent of citizens have concealed carry permits.  *See* John R. Lott, Jr., *Concealed Carry Permit Holders Across the United States: 2016*, Crime Prevention Research Center, July 26, 2016, at 20.  Especially following our holding in *Foster*, I believe that statistic weighs in favor of concluding that there was no reasonable suspicion to stop Brown.

Second, to help explain why the result here is different from that in *Illinois v. Wardlow*, 528 U.S. 119 (2000), I believe it is helpful to think of justification for a *Terry* stop as a calculus in which the factors raising suspicion must, after aggregating their relative weights, add up to reasonable suspicion. Under this framing, the Supreme Court in *Wardlow* may be interpreted as suggesting that flight affords officers most of the reasonable suspicion needed to conduct a *Terry* stop. In *Wardlow*, the suspect's presence in the narcotics trafficking area while holding an object consistent with drug trafficking activity provided enough additional suspicion that, taken together with the suspect's flight, there was reasonable suspicion to support a *Terry* stop. By contrast, the tip here was so unreliable that it added less suspicion to Brown's flight than Wardlow's presence and actions in a drug trafficking area did to his. Without more than this tip, even if Brown's flight created a significant amount of suspicion, the Metro officers lacked sufficient suspicion overall to stop and frisk him.

In my view, however, the Metro officers may have been able to stop Brown in a constitutional manner if they had approached the situation differently. Because Washington law requires an individual to "have his or her concealed pistol license in his or her immediate possession at all times" and punishes the failure to produce the license on request as a civil infraction, Wash. Rev. Code § 9.41.050(1)(b), I believe the Metro officers could have approached Brown to ask him to show his concealed carry license. The officers would not have "seized" Brown, and therefore would not have required reasonable suspicion for the interaction, as long as a reasonable person in Brown's position would "feel free 'to disregard the police and go about his business.'" *See Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). And if

Brown had failed to produce the license, he would have committed a civil infraction at minimum. *See* Wash. Rev. Code § 9.41.050(1)(b). Washington law would then have permitted the officers to ask Brown for his name and, if he refused, to detain him "for a period of time not longer than is reasonably necessary to identify the person for purposes of issuing" the infraction. *Id.* § 7.80.060; *see id.* § 7.80.050, *see also State v. Duncan*, 43 P.3d 513, 519–20 (Wash. 2002). Depending on Brown's responses and reactions, the officers might even have obtained reasonable suspicion that Brown did not have a license at all, which would have made his gun possession a misdemeanor offense under § 9.41.050(1)(a). Once they had such suspicion, the officers could have conducted a full *Terry* stop and frisk.

We are not reviewing the constitutionality of such a hypothetical stop here, however, because the Metro officers did far more than approach Brown and ask him for his concealed carry license. As soon as Brown ran, the officers cornered him with guns drawn, handcuffed him, and frisked him, transforming the stop immediately into a detention that could have only been supported by reasonable suspicion existing prior to the detention.

Third, to the extent the majority opinion, particularly its reference to the Seattle Police Department's current consent decree with the U.S. Department of Justice, *see* majority opinion, at 13 n.2, could be read as suggesting that race explains why the Metro officers initiated the encounter in the first place, I want to emphasize that this is not my understanding.

Nothing in the record supports the conclusion that the officers were stopping Brown simply because he was black. In other words, I see no reason to believe the officers were using the tip as some pretext to stop Brown and that this stop

therefore fits into a longer history of Seattle law enforcement engaging in racially discriminatory policing.[1]  The concern that Brown had a gun, regardless of race, was something worth investigating, even if the circumstances ultimately fell shy of giving the officers reasonable suspicion.

Given the serious public safety threat that firearms present, we should not discourage law enforcement from investigating whether an individual carrying a gun in public is legally allowed to do so.  But law enforcement must do so in accordance with the protections of the Fourth Amendment.  Because the Metro officers here did not have reasonable suspicion when they conducted a *Terry* stop of Brown, the stop cannot stand under the Fourth Amendment.

With these points of elaboration, I join the majority opinion.

---

[1] Race might help explain why Brown ran.  As the majority opinion notes, potentially "innocent" explanations of flight include fears based on racial disparities in policing.  But race is not the only innocent explanation that can explain flight—fear of the police for any reason can. And our consideration of these innocent explanations does not mean that the level of suspicion caused by flight is necessarily reduced when the individual fleeing is black.  Here, it is the lack of additional facts suggesting Brown's flight was borne out of an effort to hide criminal behavior, such as a reliable tip or police observations suggesting illicit activity, and not Brown's race, that drives our analysis.