**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-10161 |
| *Plaintiff-Appellee*, | D.C. No. 3:21-cr-00202-WHO-1 |
| v. | |
| ROBERT HAMILTON, | |
| *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted November 17, 2023
San Francisco, California

Filed March 24, 2025

Before: Danielle J. Forrest and Salvador Mendoza, Jr.,
Circuit Judges, and Solomon Oliver, Jr.,[*] Senior District
Judge.

Opinion by Judge Forrest;
Concurrence by Judge Oliver, Jr.

---

[*] The Honorable Solomon Oliver, Jr., Senior United States District Judge
for the Northern District of Ohio, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel affirmed Robert Hamilton's conviction and sentence for being a felon in possession of a firearm and ammunition and possessing a firearm in furtherance of a drug-trafficking crime.

Law enforcement had specific information connecting Hamilton to an unlawful shooting. When they located and tried to stop him two weeks after the shooting, he ran. The officers chased Hamilton on foot for several blocks, and observed him reaching for his waistband. An officer ordered Hamilton to show his hands and get on the ground, but Hamilton continued running. A second police car stopped in front of Hamilton, and officers tackled him to the ground. Hamilton was handcuffed and arrested. After the arrest, officers searched Hamilton and found a gun, marijuana, scales, and $6,692 in cash.

The panel affirmed the district court's denial of Hamilton's motion to suppress.

- Hamilton asserted that the officers' attempt to stop him was unlawful because they intended to conduct an arrest, not merely an investigatory stop, from the outset. The panel explained that the officers' intent when they initially approached Hamilton is immaterial because he ran before the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

officers could do anything other than order him to stop, and they did not actually seize him. Thus, in the officers' initial contact, the Fourth Amendment was not triggered.

- Hamilton contended that the officers' initial approach was improper because one of them falsely stated that there was a warrant for his arrest. The panel explained that even if this was a lie rather than a mistake, there was no constitutional violation because the officers had reasonable suspicion that Hamilton was involved in the shooting, which Hamilton does not dispute. The officers therefore had a lawful basis to stop and question him without a warrant. Additionally, the officers, whose actions and words made clear that they were approaching in an official investigatory capacity, were not misrepresenting their purpose. And because Hamilton did not stop and no arrest occurred, the officers did not exceed their authority. There is no basis on which to conclude the officers' initial approach was unreasonable.

- Hamilton argued that his arrest was unlawful because the officers did not have probable cause to believe he had committed a crime. The panel noted that flight is not *per se* suspicious. But here, the officers had specific evidence that connected Hamilton to the unlawful shooting, there was no ambiguity about the officers' identities, they

called Hamilton by name and ordered him to stop, and they observed him reaching for his waistband while fleeing. Therefore, when the officers tackled Hamilton to stop his flight, they had reason to conclude that there was a fair probability that he had committed a crime, and the arrest was lawful.

The panel held that the district court did not abuse its discretion in instructing the jury that the evidence was obtained legally and that the jury may not speculate as to whether the police had improper motives in arresting and searching Hamilton. When viewed in the context of the entire trial, the instruction did not improperly guide the jury or intrude on its fact-finding role.

The panel held that the district court did not abuse its discretion in applying a sentencing enhancement under U.S.S.G. § 2K2.1(b)(6)(B) for possessing a gun in connection with another felony offense.

District Judge Oliver concurred. He wrote separately to add some factual and legal context to the discussion regarding probable cause, and to indicate two areas where his analysis varies from the majority—the analysis applied to determine when deception and falsehoods by officers are permissible consistent with the Fourth Amendment, and the relevance of the fact that the arrest took place in a high crime area.

## COUNSEL

Evan M. Mateer (argued) and Merry J. Chan, Assistant United States Attorneys; Matthew M. Yelovich, Chief, Appellate Section, Criminal Division; Ismail J. Ramsey, United States Attorney; Office of the United States Attorney, United States Department of Justice, San Francisco, California; for Plaintiff-Appellee.

Yevgeniy M. Parkman (argued), Angela Chuang, and Candis Mitchell, Assistant Federal Public Defenders; Jodi Linker, Federal Public Defender; Federal Public Defenders Office, San Francisco, California; for Defendant-Appellant.

## OPINION

FORREST, Circuit Judge:

Flight from law enforcement can be suggestive of wrongdoing and give rise to probable cause when coupled with specific reasons to suspect that the person fleeing may have engaged in criminal conduct. Here, law enforcement had specific information connecting Defendant Robert Hamilton to an unlawful shooting in downtown San Francisco. When they located and tried to stop Hamilton two weeks after the shooting, he ran. The totality of circumstances surrounding Hamilton's flight gave the officers probable cause to arrest him. Therefore, we affirm the district court's denial of Hamilton's motion to suppress the evidence obtained from his arrest. We also reject Hamilton's jury-instructions and sentencing-enhancement challenges and affirm his conviction and sentence.

## I.   BACKGROUND

## A.  Valentine's Day Shooting

Around 2:00 a.m. on February 14, 2021, officers from the San Francisco Police Department responded to reports of a shooting in the Tenderloin neighborhood of San Francisco. Sergeant Habib interviewed the three victims who were shot. The first victim stated that he saw a "small Black man" approach a Black woman and begin arguing with her. The victim then saw the man take the woman to his four-door car. Soon after, the victim heard five gunshots. The victim described the man's clothing, said that he had no facial hair, and estimated his age and height.  The victim relayed that he "believe[d]" that the man and woman were related.

The second victim similarly reported seeing a Black man shoot a gun from a four-door car. And the third victim said that he saw a black four-door car double parked around the time of the shooting, but he could not provide a description of the shooter.

Sgt. Habib reviewed surveillance footage of the shooting, which showed a taxi arrive at the intersection of the shooting. A woman exited the taxi and crossed the street out of the camera's frame. A few seconds later, a black Hyundai appeared and parked behind the taxi. The driver of the Hyundai—a Black man—exited the car and walked out of the camera's frame in the same direction as the woman. One minute later, the man and the woman re-entered the camera's frame and appeared to be arguing. The man grabbed the woman and pulled her into the passenger seat of the Hyundai. He then got into the driver's seat and, while driving away, appeared to shoot a gun out of the driver's side window.

The surveillance video captured the taxi's car number and the black Hyundai's license plate. Sgt. Habib contacted the taxi company and learned the name and address of the woman the taxi dropped off at the intersection of the shooting. He then checked for other residents at the woman's address and learned that Hamilton lived at that location. Sgt. Habib reviewed Hamilton's mug shot and related information and, based on the shooter's stature in the surveillance video, believed that Hamilton may have been the shooter. A record check also revealed that Hamilton had prior firearm-related convictions.

A search of the Hyundai's license plate showed that it was registered to a rental company. Sgt. Habib contacted the rental company and learned that the Hyundai was rented out for a several-day period that included the day of the shooting. Screenshots from the Hyundai's dash camera showed a Black man in the driver's seat and a Black woman in the passenger seat on February 8. Sgt. Habib noted that the man captured on the dash camera looked similar to Hamilton's mug shot. GPS data confirmed that the Hyundai was at the intersection of the February 14 shooting just before the shooting occurred.

Sgt. Habib showed the surveillance footage and the dash camera image to two officers who had previously encountered Hamilton. The officers identified the man in the surveillance footage as Hamilton and the woman as Hamilton's mother. Both officers also identified the driver in the dash camera image as Hamilton.

## B. Hamilton's Arrest

Around 4:00 p.m. on February 27, 2021, an officer involved in the shooting investigation, Sgt. Payne, spotted Hamilton several blocks away from where the Valentine's

Day shooting occurred. He advised other officers in the area that Hamilton was wanted for the Valentine's Day shooting, that the gun used in the shooting was missing, and that it was "highly likely" that Hamilton had it on his person. Officers knew this to be a high-crime area where drug sales, shootings, and other crimes routinely occur. Sgt. Payne told the officers that Hamilton was a 25-year-old Black man wearing a black jacket, black pants, and a red shirt. And Sgt. Habib gave the officers two photos of Hamilton.

One officer in the area saw a Black man approximately 25 years old wearing the clothes that Sgt. Payne described. The officer also noted that the man matched the photos of Hamilton. Several officers then met up and "devised a plan to take Hamilton into custody."

Shortly thereafter, two officers pulled up to Hamilton in their patrol car. One officer told Hamilton that the officers needed to speak with him. The other officer called Hamilton's name and told him that there was a warrant for his arrest and ordered him to stop. Hamilton looked at the officers and immediately ran. The officers chased Hamilton on foot for several blocks, and they observed him reaching for his waistband. Based on this action, the officers believed that Hamilton had a gun. An officer ordered Hamilton to show his hands and get on the ground, but Hamilton continued running.

A second police car stopped in front of Hamilton, and officers tackled him to the ground. Hamilton was handcuffed and arrested. After the arrest, officers searched Hamilton and found a gun, marijuana, scales, and $6,692 in cash.

## C.  District Court Proceedings

On May 13, 2021, Hamilton was indicted with one count of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). The grand jury later returned a superseding indictment adding a charge of possessing a firearm in furtherance of a drug-trafficking crime in violation of 18 U.S.C. § 924(c)(1).

Hamilton moved to suppress all the evidence obtained from his arrest and subsequent searches, arguing that the officers lacked probable cause to arrest him. The district court denied Hamilton's motion. The district court determined that when the officers initially approached Hamilton on February 27, they had reasonable suspicion (but not probable cause) to believe that Hamilton was involved in the Valentine's Day shooting. The district court also determined that the officers' suspicion developed into probable cause to arrest when they saw Hamilton flee and subsequently reach for his waistband.

At trial, over Hamilton's objection, the district court instructed the jury that the evidence presented was obtained legally and directed jurors to not speculate as to whether the police had improper motives in arresting and searching Hamilton. The jury convicted Hamilton of possessing a firearm and ammunition but acquitted him of possessing a firearm in furtherance of a drug-trafficking crime. Hamilton moved for a new trial, arguing that the jury instruction vouched for the arresting officers and affected the jury's consideration of whether the gun was planted. The district court denied this motion, concluding that Hamilton waived his objection to the jury instruction, that the instruction was not erroneous, and that any error was harmless.

During sentencing, the district court found that when Hamilton was arrested, he possessed the gun in connection with dealing marijuana. Based on this finding, the court applied a four-level sentencing enhancement under U.S.S.G. § 2K2.1(b)(6)(B) for possessing a gun in connection with another felony offense. The court sentenced Hamilton to 27 months' imprisonment.

## II.  DISCUSSION

### A.  Motion to Suppress

Hamilton argues that the evidence found on him when he was arrested must be suppressed because the officers lacked probable cause for arrest and his arrest was executed in an unreasonable manner. Both arguments fail.

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he ultimate touchstone of the Fourth Amendment is reasonableness." *United States v. Anderson*, 101 F.4th 586, 591 (9th Cir. 2024) (en banc) (internal quotation marks and citation omitted). We consider the totality of the circumstances in assessing whether law enforcement acted reasonably. *See Samson v. California*, 547 U.S. 843, 848 (2006). We review a district court's denial of a motion to suppress de novo, and we review its factual findings for clear error. *United States v. Fisher*, 56 F.4th 673, 682 (9th Cir. 2022).

### 1.  The Officers' Initial Approach

The district court concluded that the officers had a lawful basis to stop Hamilton because they reasonably suspected

that he was involved in the Valentine's Day shooting.[1] Hamilton does not dispute this. Nonetheless, Hamilton asserts that the officers' attempt to stop him was unlawful because they intended to conduct an arrest, not merely an investigatory stop, from the outset.

Under the circumstances presented, the officers' intent when they initially approached Hamilton is immaterial because he ran before the officers could do anything other than order him to stop. Thus, in their initial approach, the officers only attempted a seizure. They did not actually seize Hamilton. *See United States v. Smith*, 633 F.3d 889, 893 (9th Cir. 2011) ("[T]here is no seizure without actual submission; otherwise, there is at most an attempted seizure . . . ." (quoting *Brendlin v. California*, 551 U.S. 249, 254 (2007))). And where no seizure occurred during the officers' initial contact with Hamilton, the Fourth Amendment was not triggered. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) (holding that a seizure does not occur when the subject does not yield after an officer's show of authority); *Smith*, 633 F.3d at 892 (holding that an attempted stop cannot violate the Fourth Amendment if there was no seizure).

Moreover, the Supreme Court has instructed that "outside limited contexts such as an 'inventory search or administrative inspection . . . an officer's motive [does not] invalidate[] objectively justifiable behavior under the Fourth Amendment.'" *Kentucky v. King*, 563 U.S. 452, 464 (2011) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)); *see also United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295 (9th Cir. 1988) ("The proper focus when

---

[1] We need not and do not address whether the district court erred in concluding that the officers lacked probable cause to arrest Hamilton for the Valentine's Day shooting based on their pre-arrest investigation.

determining coerciveness or restraint sufficient to constitute
an arrest or detention is not on the subjective belief of the
agents. Rather we review the situation from the perspective
of the person seized."). Hamilton does not dispute that the
officers had "objectively justifiable" grounds to conduct an
investigatory stop based on reasonable suspicion. *King*, 563
U.S. at 464. And if Hamilton had not fled and the officers
had immediately arrested him, a different analysis would
apply. But that is not what happened, and we must decide
this case based on the facts as they are, not as they might
have been.

Hamilton further contends that the officers' initial
approach was improper because one of them falsely stated
that there was a warrant for his arrest. While the officer's
statement about the existence of an arrest warrant was
incorrect, the record does not establish whether it was a lie
or a mistake. But even assuming it was a lie, there was no
constitutional violation. Officers are not categorically
prohibited from using deception in investigations. *See, e.g.*,
*Lewis v. United States*, 385 U.S. 206, 208–09 (1966)
(recognizing that "it has long been acknowledged" that law
enforcement can use deceptive tactics in their investigations
subject to the protections in the Bill of Rights); *United States
v. Carona*, 660 F.3d 360, 365–66 (9th Cir. 2011) (same). But
deception may be unreasonable if it is used "to gain access
to places and things [officers] would otherwise have no legal
authority to reach." *United States v. Ramirez*, 976 F.3d 946,
954 (9th Cir. 2020) (quoting *United States v. Alverez-Tejeda*,
491 F.3d 1013, 1017 (9th Cir. 2007)). For example, where a
suspect knows that he is dealing with law enforcement,
officers are prohibited from abusing their position to gain
access to evidence "by affirmative[ly] or deliberate[ly]

misrepresent[ing] the nature of [their] investigation." *United States v. Little*, 753 F.2d 1420, 1438 (9th Cir. 1984).

Here, the officers had reasonable suspicion that Hamilton was involved in the Valentine's Day shooting, which Hamilton does not dispute. Therefore, they had a lawful basis to stop and question him without a warrant. *Florida v. Royer*, 460 U.S. 491, 498 (1983); *cf. Alverez-Tejeda*, 491 F.3d at 1017 (concluding officers did not improperly gain access where "they already had the authority to seize [the evidence and the defendant]; their lies didn't have *the effect* of expanding their ostensible authority beyond the scope of their actual authority" (emphasis added)). Additionally, the officers' actions and words made clear that they were approaching Hamilton in an official investigatory capacity. They were not misrepresenting their purpose. And because Hamilton did not stop and no arrest occurred, the officers did not exceed their authority. In short, there is no basis on which to conclude that the officers' initial approach was unreasonable.

Hamilton suggests that upholding his arrest despite the officers' false statement would allow law enforcement to go on fishing expeditions—randomly approaching people on the street to manufacture probable cause when they flee. That is hyperbole and not what happened here. The officers did not contrive a situation to get Hamilton to flee. Hamilton chose to run knowing who the officers were, that they knew who he was, and that he had been ordered to stop. Hamilton's choice to run is properly considered in assessing the totality of circumstances that surrounded the officers' actions. *See United States v. Brown*, 925 F.3d 1150, 1155–56 (9th Cir. 2019).

## 2.  Hamilton's Arrest

Hamilton also argues that his arrest was unlawful because the officers did not have probable cause to believe he had committed a crime.

Probable cause justifying a warrantless arrest exists where, "under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a *fair probability* that the suspect had committed a crime." *United States v. Struckman*, 603 F.3d 731, 739 (9th Cir. 2010) (emphasis added) (internal quotation marks and citation omitted). Probable cause can develop during the course of an event. *See Illinois v. Wardlow*, 528 U.S. 119, 125–26 (2000). The Supreme Court has instructed that "[h]eadlong flight—wherever it occurs— is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124. Even where an "individual has a right to ignore the police and go about his business, . . . [f]light, by its very nature, is not 'going about one's business'; in fact, it is just the opposite." *Id.* at 125.

That said, flight is not *per se* suspicious. *See Brown*, 925 F.3d at 1155. Consistent with the Fourth Amendment's totality standard, "[t]here may be circumstances where a person's flight has a perfectly innocent and reasonable explanation" and thus does not reasonably engender suspicion. *Smith*, 633 F.3d at 894. And if the reason for the suspect's flight is ambiguous—that is, it could have been to evade law enforcement or it could have been for some other innocent purpose—the flight itself cannot justify an arrest. *See Wong Sun v. United States*, 371 U.S. 471, 482–84 (1963); *Brown*, 925 F.3d at 1155–56.

Relying on *Wong Sun* and *Brown*, Hamilton argues that his flight was ambiguous and could not establish probable cause for arrest. These cases are distinguishable. In *Wong Sun*, officers were investigating a tip that someone named "Blackie Toy" was selling drugs out of a laundromat. 371 U.S. at 473–74. An officer went to the laundromat and told the defendant, who answered the door, that he wanted laundromat service. *Id.* at 474. The defendant stated that the laundromat was closed and tried to shut the door. *Id.* The officer then identified himself as a narcotics officer, and the defendant slammed the door and ran down the hall. *Id.* The Court concluded that the reason for the defendant's flight was ambiguous because the officer had not "adequately dispelled the misimpression engendered by his own ruse" or established that the defendant was the person suspected of selling drugs before the defendant ran. *Id.* at 482–83.[2]

In *Brown*, the defendant was engaged in "presumptively lawful" conduct—carrying a concealed firearm—when police approached him to investigate an anonymous tip describing a "black man '[with] a gun'" and he fled. 925 F.3d at 1153. There was no indication that the defendant had or was engaged in any criminal activity. *Id.* Thus, we concluded that "the totality of the circumstances" did "not add up to enough: no reliable tip, no reasonable inference of criminal behavior, no police initiative to investigate a particular crime in an identified high crime area, and flight without any previous attempt to talk to the suspect." *Id.* at 1157. We further stated that "racial dynamics in our society" provided a potential innocent explanation for the defendant's flight

---

[2] *Wong Sun* was decided before *Terry*, so it did not analyze whether law enforcement had reasonable suspicion of criminal activity.

where there was no indication of criminal activity that would warrant investigation. *Id.*

In contrast, here the officers had specific evidence that connected Hamilton to an unlawful shooting less than two weeks before they tried to stop him. There was no ambiguity about the officers' identities, unlike in *Wong Sun*, and they called Hamilton by name and ordered him to stop. Hamilton's arguments about racial disparities in policing cannot overcome the circumstances at issue or "commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. It is reasonable to infer, given the totality of circumstances, that Hamilton ran to evade law enforcement. *See id.* at 124; *Struckman*, 603 F.3d at 740 ("In assessing probable cause, we take into account reasonable inferences."). Indeed, this case is analogous to *Smith*, where we held that the defendant's flight reasonably suggested wrongdoing where he was in a high-crime area, the officer activated his siren and clearly identified himself before ordering the defendant to stop, the defendant understood that the officer was talking to him, and then the defendant fled. 633 F.3d at 891; *see also Sibron v. New York*, 392 U.S. 40, 66–67 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."); *United States v. Cruz*, 910 F.2d 1072, 1077 (3d Cir. 1990) ("Flight at the approach of law enforcement officers, when coupled with specific knowledge relating the suspect to evidence of a crime, is a proper factor to be considered in the decision to make an arrest.").

Additionally, the officers also observed Hamilton reaching for his waistband while fleeing. Hamilton argues that this action was also ambiguous and not a proper basis for suspecting wrongdoing because it could have indicated that his pants were falling down. This is unpersuasive. Officers "need not rule out the possibility of innocent conduct" in forming suspicion of criminal activity. *United States v. Valdes-Vega*, 738 F.3d 1074, 1078–79 (9th Cir. 2013) (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). Reasonable inferences can be relied upon. *Struckman*, 603 F.3d at 740. And where the officers had specific evidence connecting Hamilton to a recent unlawful shooting, knew that the gun from the shooting had not been recovered, and also knew that Hamilton had a prior firearm offense and might be armed, the officers could reasonably infer that Hamilton reaching for and clutching his waistband indicated that he was armed. *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 111–12 (1977) (concluding that an officer may reasonably believe an individual is armed based on perceiving a bulge in a jacket).

For these reasons, when the officers tackled Hamilton to stop his flight, they had reason to conclude that there was a "fair probability that [Hamilton] had committed a crime," *Struckman*, 603 F.3d at 739, and the district court correctly concluded that Hamilton's arrest was lawful. Therefore, we affirm the district court's denial of Hamilton's motion to suppress.

## B.  Jury Instructions

Next, Hamilton argues that the district court erred by instructing the jury that the evidence was obtained legally, and the jury may not speculate as to whether the police had improper motives in arresting and searching Hamilton.

As a preliminary matter, the Government contends that Hamilton waived any objection to the jury instructions because his counsel stated that the "instruction as to the legality of the stop was sufficient to advise the jury," and because counsel indicated that the defense was satisfied with the jury instructions. Alternatively, the Government argues that Hamilton forfeited his objection to the jury instructions because he failed to specify the grounds for this objection before his motion for a new trial. Neither argument is persuasive. The Government's waiver argument ignores Hamilton's objections to the challenged instruction during trial. *See United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (waiver occurs where a defendant "affirmatively acted to relinquish a known right"). Likewise, Hamilton did not forfeit his jury-instruction challenge because, as in *Shorter v. Baca*, he "objected to the . . . instruction at trial, albeit on a different ground, and in a motion for new trial." 895 F.3d 1176, 1183 (9th Cir. 2018).

On the merits, "we review the district court's formulation of its instructions for abuse of discretion." *United States v. Mikhel*, 889 F.3d 1003, 1056 (9th Cir. 2018). "[A] district court abuses its discretion in formulating instructions if 'the instructions—taken as a whole and viewed in context of the entire trial—were misleading or confusing, inadequately guided the jury's deliberations, or improperly intruded on the fact finding process.'" *Id.* at 1058 (citation omitted).

Here, the instruction that Hamilton challenges stated in full:

> The evidence in this case was obtained legally. It is not for you to consider or to speculate whether any evidence presented to

> you was obtained improperly or in violation of law.
>
> You also may not speculate as to whether the police had any improper motives in arresting or searching the defendant on February 27, 2021.

Hamilton argues that this instruction intruded on the jury's fact-finding role, undermining his defense that the officers planted the gun, and improperly vouched for the officers who arrested Hamilton. But Hamilton's requested instruction also removed the legality of the search from the jury's purview.[3] And when viewed in context of the entire trial, the court's instruction did not improperly guide the jury or intrude on its fact-finding role. *See id.* As the district court explained, other instructions emphasized that the Government had to prove that Hamilton knowingly possessed the gun and made clear that issue was for the jury to decide. Additionally, the instruction that the jury "may not speculate as to whether the police had any improper motives in arresting or searching the defendant" did not credit the officers' trial testimony. *See United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005). Rather, it directed the jury not to inquire into why the officers stopped Hamilton,

---

[3] Hamilton's requested instruction read:

> Whether or not the arrest and search of the defendant was lawful is a legal matter that has been resolved by the Court and that is not within the scope of your role as jurors. It is not for you to consider or to speculate whether any evidence presented to you was obtained improperly or in violation of law.

as Hamilton recognized at trial. Thus, the district court did not abuse its discretion in instructing the jury.

## C. Sentencing

Finally, Hamilton argues that the district court erred by applying a four-level sentencing enhancement under U.S.S.G. § 2K2.1(b)(6)(B) for possessing a gun "in connection with another felony offense." "We review the district court's factual findings for clear error . . . and its application of the Guidelines to the facts for abuse of discretion." *United States v. Harris*, 999 F.3d 1233, 1235 (9th Cir. 2021).

The district court found that Hamilton was dealing marijuana on the day he was arrested. The record supports this finding. Hamilton had a large amount of marijuana, two scales, and over $6,000 in cash with him when he was arrested. The district court also found, based on a preponderance of evidence, that Hamilton possessed the gun in connection with dealing marijuana, noting the expert testimony from trial that people involved in drug trafficking "often need and have a weapon in order to protect the cash that they have, the drugs that they have." The district court's findings were not clearly erroneous. *See United States v. Syrax*, 235 F.3d 422, 427 (9th Cir. 2000). Accordingly, the district court did not abuse its discretion in applying § 2K2.1(b)(6). *See United States v. Grimaldo*, 993 F.3d 1077, 1082 (9th Cir. 2021).

**AFFIRMED.**

SOLOMON OLIVER, JR., Senior District Court Judge, concurring.

I agree with the majority that the trial court's denial of Defendant's motion to suppress should be affirmed. I also agree with the majority that the district court did not abuse its discretion in instructing the jury, or in applying a sentencing enhancement. I write to add some factual and legal context to our discussion regarding probable cause, and to indicate two areas where my analysis varies from the majority. The first centers on the analysis applied to determine when deception and falsehoods by officers are permissible consistent with the Fourth Amendment. The second is in regard to whether the fact that the arrest took place in a high crime area was relevant. Otherwise, I join in the majority opinion, and neither of these differences causes me to disagree with the majority opinion that there was probable cause for the arrest.

The district court concluded that the officers initially only had sufficient evidence to conduct a *Terry* stop of Defendant. *See Terry v. Ohio*, 392 U.S. 1 (1968). The officers had some evidence that Defendant committed the crime as discussed by the majority; however, the vantage point of the surveillance camera made it difficult to identify the shooter. The three victims of the shootings were only able to give vague descriptions of the shooter. The officers who identified Defendant as the person in the video could only do so based on Defendant's "stature" because of the poor quality of the video. It is undisputed that no warrant was obtained during the almost two weeks that elapsed between the shooting and Defendant's arrest. The district court concluded, based on the information the officers obtained during their investigation and the facts and

circumstances surrounding Defendant's flight from police, that there was probable cause to arrest Defendant.

The majority concluded, as did the trial court, that the evidence previously gathered by the police department was sufficient to conduct an investigatory stop of Defendant pursuant to *Terry*. Defendant conceded this point. However, the record indicates that, when the officers confronted Defendant, they were ready to arrest him, not merely investigate him pursuant to *Terry*. According to a declaration of Sergeant Habib, the lead investigator, he ordered the officers to "bring Hamilton into custody" and "arrest Hamilton based on [his] investigation." To "facilitate the arrest," he sent them mugshots of Hamilton. When the officers pulled up to Hamilton in their patrol cars, one officer said, "Hey come here. We need to talk to you." This was followed in seconds by another officer who said, "Robbie Hamilton, there is a warrant for your arrest. I need you to stop!" Hamilton then took off running. After Hamilton was apprehended, he asked, "What's going on?" and an officer responded, "Like I announced to you as soon as I saw you, there is a warrant for your arrest."

As the majority states, law enforcement can, under some circumstances, use deception or falsehoods in carrying out its responsibilities. The majority also acknowledges that there are some limits on the circumstances when they may do so. For example, in the context of a *Terry* stop, officers' falsehoods or deception could cause an investigatory detention to cross the line beyond a permissible *Terry* stop. This would occur if the measures employed "would cause a reasonable person to feel that he or she will not be free to leave after brief questioning–i.e., that indefinite custodial detention is inevitable[,]" and that the measures were not justified based on the government's interests in officer safety

and investigating crime. *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (citations omitted).

Here, despite having the evidence that would justify a *Terry* stop, as acknowledged by Defendant, the officers did not intend, nor did they execute, a *Terry* stop. Such a stop would arguably have been justified based on the evidence regarding Defendant's alleged involvement in criminal activity that took place almost two weeks earlier. However, such a stop would not have been justified based on suspicion that he was involved in criminal activity when they spotted him. Indeed, Defendant was not in the area where the crime at issue took place, and he was not exhibiting any behavior suggesting he was engaged in other criminal activity at that time. Further, he was not posing any known danger to the officers or anyone else, such as to justify detaining him in aid of a *Terry* stop. Based on the facts, as established in the record, Defendant would reasonably have concluded that the officers were not just seeking to talk to him, but to arrest him pursuant to a warrant. He would likely not have felt free to leave after brief questioning. This might have been the case regardless of whether the announcement by the particular officer was a deliberate falsehood or mistake, based on the fact that he was told there was a warrant for his arrest. That said, I agree with the majority that, if Defendant had not fled and was immediately arrested, we would be performing a different analysis, namely whether the officers had gone beyond the bounds of an investigatory stop in arresting him.

In light of the fact that Defendant fled, we must now view the totality of the circumstances leading up to his arrest in order to determine whether there was probable cause to arrest him. In doing so, we still must evaluate whether the officers' misrepresentation that they had a warrant—when they did not—caused a violation of Defendant's rights under

the circumstances herein. Though my analysis differs from the majority in part, I agree that no constitutional violation occurred here. While it is true that officers may use deception in certain circumstances to carry out their law enforcement responsibilities, we have made it clear that, "[l]aw enforcement does not have carte blanche to use deception to effect a search and seizure. A ruse that reveals the officers' identity as law enforcement but misrepresents the purpose of their investigation so that the officers can evade limitations on their authority raises serious Fourth Amendment concerns." *United States v. Ramirez*, 976 F.3d 946, 955 (9th Cir. 2020).

Here, the officers clearly indicated that they were law enforcement and represented that they had authority to make an arrest pursuant to a warrant, which they did not then possess. It is only because they were unsuccessful in arresting Defendant at that point that one can conclude there was no Fourth Amendment violation. I disagree with the majority's statement that the officers "were not misrepresenting their purpose." On the contrary, they had no authority to arrest him immediately, if at all, pursuant to a *Terry* stop. Thus, they were misrepresenting their purpose. If they had arrested him without probable cause on the representation that they had a warrant, and obtained incriminating evidence, there might well have been a Fourth Amendment violation.

I also agree with the majority that what happened during Defendant's flight after being confronted by the officers, together with what the officers had gathered during their investigation, gave them probable cause to arrest him. The officers had evidence that he was involved in the Valentine's Day shooting, which would have allowed them to perform an investigatory stop. The majority opinion also points to the

fact that Defendant was fleeing when arrested and that this took place in a high crime neighborhood. Further, while fleeing from the officers, Defendant tugged at his waistband, which suggested to the officers that he was carrying a weapon. It is my view that what Defendant did during flight is more significant than the fact of his fleeing. After all, running, when confronted by the police, is not always sufficient to establish probable cause. As the majority acknowledges, there may be a "perfectly innocent and reasonable explanation" for flight. *Smith*, 633 F.3d at 894. Further, the court in *Brown* found that there was no probable cause to arrest when a man fled from officers seeking to investigate an anonymous tip describing a "black man '[with] a gun'"; there was, under the totality of the circumstances, no indication of activity warranting investigation. There, we found that "racial dynamics in our society" might serve as an innocent explanation for the suspect's flight. Here, there was more evidence supporting probable cause than in *Brown*, including the evidence gathered during Sergeant Habib's investigation and Defendant's tugging at his waistband while fleeing.

However, I would give little weight to the fact that Defendant was arrested in a high crime area. We have noted that, "[t]he citing of an area as 'high crime' requires careful examination by the court, because such a description, unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000). The cases where we have given weight to the fact that the person was arrested in a high crime area while fleeing officers usually involved the officers' observance of suspicious activity of a type they were investigating in that neighborhood. That was not the case here. The crime for which they were

investigating Defendant occurred almost two weeks prior in an entirely different neighborhood. There is little evidence to suggest that the neighborhood in which Defendant was arrested should be accorded any significant weight in determining probable cause in this case. Nevertheless, the other evidence is sufficient to support a finding of probable cause.

For all of the foregoing reasons, I would affirm the district court in respect to all issues raised on appeal.